BAJA CONTRACTORS, INC., et al.,
Plaintiffs-Appellees,

v.

The CITY OF CHICAGO, et al.,
Defendants-Appellants.

No. 86–1990.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 20, 1987.

Decided Sept. 16, 1987.

Rehearing Denied Oct. 20, 1987.

Frederic R. Klein, Schiff, Hardin & Waite, Chicago, Ill., for defendants-appellants.

Michael J. Daley, Niesen Elliott & Meier, Chicago, Ill., for plaintiffs-appellees.

Before FLAUM and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Appellees, Baja Contractors, Inc. (Baja) and Humberto Jaimes, filed suit under 42 U.S.C. § 1983 against the City of Chicago and certain City employees, Mary Skipton, Leroy Bannister, Paul Spieles, McNair Grant and Sam Patch (referred to collectively as the City), alleging that the City's administration of the Minority Business Enterprise (MBE) program violated the fourteenth amendment's due process clause. After having granted Baja MBE certification, the City classified Baja as a "concrete contractor." It later refused to permit Baja to use its MBE certification to receive credit for work done as a "concrete supplier" without reapplication. When Baja reapplied, it was denied certification. After a hearing on Baja's motion for a preliminary injunction, the district court issued a preliminary injunction restraining the City from, *inter alia*, determining that

Baja is not a concrete supplier under the MBE program until the City conducted a review of Baja's application "in accordance with due process requirements established to preserve and protect Baja's property rights pursuant to applicable laws." *Baja Contractors, Inc. v. City of Chicago*, No. 86 C 2655, Amended Preliminary Injunction at 6 (N.D.Ill. June 12, 1986); R.41 at 6. For the reasons set forth in this opinion, we reverse the judgment of the district court.

## I

## Facts

### A. *Introduction*

Baja, an Illinois corporation, was formed in 1983 by Humberto Jaimes and Andres Hortatsos. In August, 1983, the Illinois Department of Transportation certified Baja to perform "miscellaneous concrete construction" work on state contracts as a disadvantaged/minority business enterprise. In December 1984, Baja applied to the City for MBE certification. On the application, it listed the nature of its business as "concrete contractor." The City granted this application for certification on February 28, 1985 and listed Baja as a "concrete contractor" in its directory of MBEs. However, when Baja started work-

ing on a City contract supplying concrete, city officials notified Baja that it needed a separate MBE certification as a concrete supplier. Baja then filed an application for certification as a concrete supplier. The City denied this application. After attempting to appeal the denial of certification within the City administration,[1] Baja sought injunctive relief.

Before analyzing Baja's procedural due process claim against the City, we will first describe the structure of the City's MBE program and then discuss in greater detail Baja's efforts to obtain MBE certification as a concrete supplier.

### B. *The City's MBE Program*

The purpose of the MBE program is to afford businesses owned and controlled by members of historically disadvantaged groups, including minority groups and women, an increased opportunity to compete for contracts. The City's MBE program initially was implemented because the City received funds from the United States Department of Transportation (US-DOT) and was required by the USDOT to establish an MBE program approved by the USDOT that would apply to all federally-funded contracts. The City's program was established pursuant to USDOT regulations contained in 49 C.F.R. part 23.[2] In

---

1. Baja also filed an appeal with the USDOT pursuant to 49 C.F.R. § 23.55 (1986). *See infra* notes 3 & 7.

2. The USDOT regulations define a minority business enterprise (MBE) as "a small business concern ... which is owned and controlled by one or more minorities or women." Under the regulations, ownership and control means that a business must be "at least 51 per centum owned by one or more minorities or women or, in the case of a publicly owned business, at least 51 per centum of the stock of which is owned by one or more minorities or women; and [its] management and daily business operations are controlled by one or more such individuals." 49 C.F.R. § 23.5(f) (1986).
   The regulations further provide that:
   The following standards shall be used by recipients in determining whether a firm is owned and controlled by one or more minorities or women is [sic] and shall therefore be eligible to be certified as an MBE. Businesses aggrieved by the determination may appeal in accordance with procedures set forth in § 23.55.

Bona fide minority group membership shall be established on the basis of the individual's claim that he or she is a member of a minority group and is so regarded by that particular minority community. However, the recipient is not required to accept this claim if it determines the claim to be invalid.
   An eligible minority business enterprise under this part shall be an independent business. The ownership and control by minorities or women shall be real, substantial, and continuing and shall go beyond the *pro forma* ownership of the firm as reflected in its ownership documents. The minority or women owners shall enjoy the customary incidents of ownership and shall share in the risks and profits commensurate with their ownership interests, as demonstrated by a [sic] examination of the substance rather than form of arrangements. Recognition of the business as a separate entity for tax or corporate purposes is not necessarily sufficient for recognition as an MBE. In determining whether a potential MBE is an independent business, DOT recipients shall consider all relevant factors, including the

August 1980, the City's first MBE program was submitted to the USDOT for approval. On June 16, 1981 a revised version of the program was submitted. *See* R.48, Defendants' Ex. 24.

In April 1985, Mayor Harold Washington issued Executive Order 85–2 (Executive Order), designed to augment the City's existing MBE program. The Executive Order mandated that the specifications for construction contracts contain a requirement that the "bidder commit to the expenditure of 25% of the dollar value of the contract (including any modifications) with one or more MBEs and 5% of the dollar value with one or more WBEs [women business enterprises]." R.1, Ex. A at 4–5. The Executive Order also required the City's Purchasing Agent to "[i]ssue rules and regulations to implement the procedures designed by the Contract Compliance Officer...." *Id.* at 7. Under the Executive Order, the Contract Compliance Officer was directed to:

> Establish uniform procedures to apply for certification as MBE or WBE, and to appeal from denial of certification as MBE or WBE. Each application for certification shall be in writing, and executed under oath by an officer or owner of the applicant, and shall contain such information as may assist the Contract Compliance Officer in determining the status of the applicant.

*Id.* at 8. The City has drafted regulations to implement the Executive Order, but a final set of rules under the Executive Order had not been issued at the time of this appeal. The district court found that the Executive Order did not incorporate the USDOT regulations, but rather required the promulgation of rules to implement its mandate separately from the federal regulations. *See* Tr. of May 14, 1986 at 18. However, much of the language contained in the Executive Order parallels the text of the USDOT regulations. For example, the City's definition of an MBE is identical to the definition contained in the USDOT regulations. *Compare* R.1, Ex. A at 3 *with* 49

C.F.R. § 23.5(f) (1986). In addition, for federally-funded projects, a contractor must comply with both the USDOT regulations and the Executive Order. *See* Minority Business Enterprise Commitment and Women Business Enterprise Commitment; Appellants' App. at 52.

The USDOT regulations express concern over maintaining the integrity of the MBE program by preventing nonminority owned enterprises from controlling MBEs. The regulations recognize that:

> Substantial concern has been expressed about the infiltration of DOT-assisted programs by "fronts"—businesses that claim to be owned and controlled by minorities, women, or other disadvantaged individuals, but which, in fact are ineligible for participation is [sic] DOT-assisted programs as MBEs, WBEs or disadvantaged businesses.
>
> The Department wants to take this opportunity to reemphasize the importance of scrutiny of all firms seeking to participate in DOT-assisted programs. We believe strongly that recipients should take prompt action to ensure that only firms meeting the eligibility criteria of 49 CFR Part 23 participate as MBEs, WBEs, or disadvantaged businesses in DOT-assisted programs. This means not only that recipients should carefully check the eligibility of firms applying for certification for the first time, but also that they should review the eligibility of firms with existing certifications in order to ensure that they are still eligible.

49 C.F.R. part 23, subpart D, app. A, at 150. In its Executive Order, the City responded to the concern expressed in the USDOT regulations about MBEs serving as "fronts" by directing the Contract Compliance Officer to:

> Investigate the status of certified MBEs and WBEs to determine whether they should retain certification. An investigation of the status of all currently certified MBEs and WBEs shall be un-

---

date the business was established, the adequacy of its resources for the work of the contract, and the degree to which financial, equipment leasing, and other relationships

with nonminority firms vary from industry practice.

*Id.* § 23.53(a)(1) and (a)(2).

dertaken immediately after the effective date of this Order, with priority given to investigation of previously certified firms to which contracts or subcontracts are awarded after the effective date hereof. R.1, Ex. A at 8–9.

The Executive Order set time limitations for the City to consider an application for MBE certification. The Executive Order provides that "[i]nitial certification of any entity as MBE or WBE, or denial of such certification, shall be completed no later than 60 days after receipt of bid or proposal for a contract or subcontract contemplating the applicant's participation as MBE or WBE." *Id.* at 8. However, the Executive Order does not specify any process of appeal from the City's decision. The USDOT regulations, on the other hand, do provide for an appeal from denial of certification.[3] However, the denial of certification is not stayed during an appeal. *See* 49 C.F.R. part 23, subpart D, app. A, at 150 (1986).

### C. *Baja's Application for MBE Certification*

On February 28, 1985, the City notified Baja by letter that it had received certification as a disadvantaged business enterprise.[4] Baja further was informed that it would be listed as a "concrete contractor" in the City's directory of MBEs and that the firm's eligibility would be reviewed on an annual basis. R.1, Ex. B.

In May 1985, Baja started working as a concrete supplier at the O'Hare Airport Development Project as a subcontractor for the Turner Construction Company (Turner). After Baja had started working at O'Hare, a city employee contacted Mr. Jaimes and notified him that Baja needed MBE certifi-

cation as a concrete supplier in order to work on the contract at O'Hare. In response, Baja sent the City a letter on July 15, 1985 requesting certification as a concrete supplier. Appellants' App. at 53; R.1, Ex. D.

In September 1985, Mr. Triplett, a city employee, inspected Baja's concrete plant at O'Hare. Mr. Triplett indicated that he was inspecting the operation to determine whether Mr. Jaimes was running the operation himself. In the report to the City regarding his site inspection, Mr. Triplett indicated that Peter J. Poulos & Sons, Inc. (Poulos) leased the concrete mixer to Baja and supplied three workers. Further, a consultant from Material Service Corp. was in charge of quality control for the mixer. Baja also leased trucks from Material Service Corp. Appellants' App. at 99–100 (oral report later committed to writing).

On September 9, 1985, the MBE Certification Committee sent a letter to Baja notifying it that it was denied MBE certification as a concrete supplier. R.1, Ex. E. The letter indicated that the City had denied certification because a review of Baja's application and supporting documents did not indicate that Baja was an independently operated business. Specifically, the letter referred to "reliance upon Pavlos [sic] and Sons, Inc. and Material Service Corp. for personnel, technical assistance, leasing of concrete plant and equipment" as evidence that Baja was not independently operated. *Id.* In this letter, the City stated that its decision was final, but notified Baja that an appeal could be filed with the USDOT. Further, a city employee informed Baja's attorney that the City generally was amenable to considering

---

**3.** The regulations provide the following means of appealing a denial of MBE certification:

Any firm which believes that it has been wrongly denied certification as an MBE or joint venture under §§ 23.51 and 23.53 by the Department or a recipient of DOT financial assistance may file an appeal in writing, signed and dated, with the Department. The appeal shall be filed no later than 180 days after the date of denial of certification. The Secretary may extend the time for filing or waive the time limit in the interest of justice, specifying in writing the reasons for so doing.

Third parties who have reason to believe that another firm has been wrongly denied or granted certification as an MBE or joint venture may advise the Secretary. This information is not considered an appeal pursuant to this section.

49 C.F.R. § 23.55(a) (1986).

**4.** The term disadvantaged business enterprise (DBE) encompasses both minority and women business enterprises. For the purposes of this appeal, the terms MBE and DBE are synonymous.

additional information about an application after it had been denied.

On September 17, 1985, Baja's attorney met with city officials and requested that they reconsider Baja's application for MBE certification as a concrete supplier. On February 20, 1986, Baja's attorney wrote to the City formally requesting reconsideration of Baja's application. Appellants' App. at 28. In this letter, Baja indicated that, if the City had not provided it a final determination by March 4, 1986, it would conclude that reconsideration had been denied. On March 6, Baja exercised its right to file an appeal from denial of certification with the USDOT. Appellants' App. at 34. Four days later, on March 10, Baja submitted additional documents and filed a formal appeal with the City. Appellants' App. at 29–30. The City's Assistant Purchasing Agent met with Mr. Jaimes and Baja's attorney regarding Baja's appeal and the City again inspected Baja's work site at O'Hare. This report indicated that "Material Service Corporation provides invoicing, billing, computerize [sic] invoice receipts, and truck leasing services to Baja at no apparent cost for these services. An employee of Material Services [sic] Corporation was seen on the premises mixing the various raw materials." Appellants' App. at 102 (oral report later memorialized). The report concluded that "[e]ssentially, Baja Contractors Incorporated is an agent for Material Service Corporation." *Id.* On April 11, Baja's attorney was informed through a telephone conversation that it was doubtful that Baja's appeal would receive favorable treatment. Subsequently, Mr. Jaimes and Baja filed this suit seeking injunctive and declaratory relief as well as punitive damages on the ground that the City denied them due process of law in considering their application for MBE certification.

## II

### The District Court Opinion

On May 16, 1986, the district court issued a preliminary injunction restraining the City from, *inter alia,* informing contractors that Baja was not certified as a con-

crete supplier under the MBE program. The district court found that Baja was owned and controlled by a member of a minority group, Humberto Jaimes, and that this minority ownership was sufficient to qualify Baja for certification as an MBE under Executive Order 85–2. The district court further held that, in its application for MBE certification, Baja did not seek limited certification. The court found that, at the time of Baja's certification, there were no existing distinctions between concrete contractors and concrete suppliers. The district court therefore concluded that Baja's certification as a concrete contractor included certification as a concrete supplier.

Regarding the City's administration of its MBE program, the district court found that McNair Grant, then the Director of Contract Monitoring and Compliance for the City, retained the sole authority to grant MBE certification to applicants that he believed were clearly entitled to receive certification. If Mr. Grant found that MBE certification was questionable, the application was then reviewed by the MBE Certification Committee. The district court found that the committee reached decisions on applications without "appropriate notice of the nature and scope of the proceedings." Tr. of May 14, 1986 at 19. The district court noted that the decisions were reached without the guidance of written procedures, ascertainable standards or a formal record.

The district court then applied the standards for granting a preliminary injunction to its findings of fact. The court stated that, in order to receive injunctive relief, Baja had the burden of showing that: 1) it had no adequate remedy at law, 2) it would suffer irreparable harm if the injunctive relief were denied, 3) the irreparable harm it would suffer if the injunction were denied would be greater than the irreparable harm the defendant would suffer if the injunction were granted, 4) it had a reasonable likelihood of prevailing on the merits, and 5) the injunction would not harm the public interest.

The district court held that Baja had sustained its burden of showing that it was entitled to injunctive relief. First, the court determined that equitable relief was necessary because it would be difficult to calculate Baja's damages from the denial of MBE status and an award of damages would not prevent the loss of contract opportunities while the litigation was pending. Second, the court concluded that Baja would suffer irreparable harm absent injunctive relief because Baja would lose contracts to competitors that had received MBE certification. Third, in balancing the harms, the court noted that the City has an interest in promoting the goals underlying the MBE program and in ensuring that the MBE program is properly administered.

In assessing the likelihood of success on the merits, the fourth requirement for injunctive relief, the court noted that it must analyze Baja's likelihood of establishing a deprivation of due process, not of establishing that it will ultimately be permitted to operate as an MBE concrete supplier. The court stated that for Baja to bring a successful due process claim, it must first be able to establish a property interest and then be able to show that the existing procedures were inadequate. The court found that Baja could establish the existence of a property interest in MBE certification as a concrete supplier in two ways: 1) the court found that Baja's initial certification as a concrete contractor included certification as a concrete supplier, and 2) the certification provided Baja with a heightened opportunity to compete for City contracts.[5] After reviewing the City's procedures for considering certification applications, the district court concluded that they were inadequate because the unwritten procedures were constantly changing and decisions were made without appropriate notice of the scope of the proceedings. The court determined that the certification decisions were made without "properly formulated and announced standards or other implementing rules and regulations." *Id.* at 19–20. Therefore, the court concluded

that there was a reasonable likelihood that Baja would be able to establish a violation of procedural due process.

Fifth, the court found that issuing an injunction to prevent the City from denying Baja procedural due process would serve the public interest by promoting the even-handed administration of the MBE program. Accordingly, the district court granted Baja's motion for a preliminary injunction.

### III

### Contentions of the Parties

#### A. *Appellants' Argument*

The focal point of the City's argument is that the district court erred in holding that Baja established a reasonable likelihood of success on the merits. The City contends that Baja did not possess a protected property interest in MBE certification as a concrete supplier. According to the City, the district court's finding that Baja's certification as a concrete contractor included certification as a concrete supplier is clearly erroneous because Baja's initial MBE application described the nature of its business as a concrete contractor and the equipment it listed as owning on the application is equipment used by a concrete contractor, not a concrete supplier. Appellants' Br. at 22.

The City also contends that the district court's alternative ground for finding that Baja had a protected property interest in MBE certification as a concrete supplier was clearly erroneous. In finding a property interest, the court relied upon two purchase orders from the Robert P. Anderson Co. (Anderson Construction) issued to Baja that provided: "Fulfillment of the terms of this purchase order is dependent upon Baja receiving certification from the City of Chicago as a 100% MBE supplier." Appellants' Br. at 24–25. The City argues that a property interest cannot be contingent upon a future grant of certifica-

---

**5.** The district court found that Baja's heightened opportunity to receive contracts was illustrated by the fact that Anderson Construction issued two purchase orders to Baja conditioned upon Baja's receipt of MBE status.

tion, but must be based upon a presently existing status or right. The City concludes that "[t]his attenuated 'right,' under recent Seventh Circuit law, does not rise to the level of a property right protected by the Fourteenth Amendment." Appellants' Br. at 25.

Even if Baja did possess a protected property interest in MBE certification as a concrete supplier, the City further disputes that Baja was deprived of due process when its application was denied. The City maintains that, because every specification for bids contained notification that the USDOT regulations published in 49 C.F.R. part 23 governed eligibility for the MBE program, Baja had notice of the standards that would be applied to evaluate its application. The City contends that Baja's application was denied because it could not demonstrate that it operated independently as a concrete supplier, rather than as a "front" for a non-minority owned business. In support of this conclusion, the City emphasizes that a non-minority owned company, Material Service Corp., supplied all of the aggregate material to produce the concrete and handled all of Baja's billing.

The City further maintains that the procedures it used to determine MBE eligibility satisfied the requirements of due process. The City claims that it has consistently applied the standards contained in the USDOT regulations since the inception of its MBE program. The City contends that, even though its procedures were unwritten, the City reviewed both of Baja's applications according to the standard internal operating procedures and the applications received careful and thorough review. The City cites *Brown v. Retirement Comm.,* 797 F.2d 521 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987), for the proposition that "the proper inquiry is not whether the internal operating practices were committed to writing, but whether the plaintiff *actually received* due process." Appellants' Br. at 29 (emphasis in original). The City further contends that Baja was not denied due process merely because the rules and regulations under the Executive Order were not promulgated but were in draft form. The City argues that until the rules were issued under the Executive Order, the USDOT regulations provided the applicable standards. Moreover, the City maintains that there was an adequate record of the proceedings to provide the basis for Baja's appeal to the USDOT of its denial of MBE certification. Specifically, the City contends that the record on appeal includes Baja's application for certification, corporate documents, two leases with Material Service Corp., income tax returns, the lease for the concrete plant, the site reports and the denial letter.

Finally, the City contends that Baja has not satisfied its burden of showing that it could meet the other requirements for injunctive relief. The City claims that Baja has an adequate remedy at law because it could only identify an anticipated $17,000 loss of profit from three contracts denied because it lacked MBE certification as a concrete supplier. The City argues that Baja did not suffer irreparable harm because it did not show any lost contract opportunities and the most it would be entitled to recover for a deprivation of due process is nominal damages. The City further maintains that the grant of injunctive relief is more harmful to it and to the public than the denial of such relief would be to Baja because the integrity of the City's MBE program would be jeopardized if Baja were serving as a "front" for non-minority owned businesses.

### B. *Appellees' Argument*

As did the appellants, the appellees first address whether the district court correctly determined that Baja has shown a likelihood of success on the merits. Baja contends that it has shown a reasonable likelihood of establishing a property interest. Baja maintains that, as a certified MBE, it would enjoy a significant advantage in competing for contracts because the MBE program creates a strong incentive for general contractors to utilize MBEs. Baja further contends that its loss of a contract with Anderson Construction after it had been denied MBE certification as a con-

crete supplier evidences that certification constitutes a beneficial property interest.

Baja also claims that the City's decision to categorize Baja as a concrete contractor but not as a concrete supplier was arbitrary. According to Baja, the City has no listing of MBE categories. Consequently, it argues that an MBE applicant must choose for itself an appropriate label when filing an application and the City is later free to interpret that label more narrowly than the applicant.

Baja also claims that the district court's decision that the City deprived Baja of procedural due process was correct. Baja contends that procedures comporting with due process require that an MBE applicant be provided meaningful notice and an opportunity to be heard before the City issues its final decision. Baja maintains that it was not notified of the City's Certification Committee meeting nor was it informed about the standards used by the committee to reach its decision. Baja contends that the City administrators were confused as to whether the appropriate standards were contained in the USDOT regulations or in the Executive Order. Further, Baja claims that the record of the City's proceedings was inadequate. Baja also maintains that improving the procedures for reviewing MBE applications would not impose an unmanageable administrative burden upon the City. Baja also notes that the City failed to follow the procedures proscribed in its submission of its MBE program to the USDOT.

Baja concludes its argument by stating that it satisfied its burden of showing that it was likely to prevail on the remaining requirements for injunctive relief. Baja contends that it has no adequate remedy at law because any monetary damages would be awarded after Baja had lost business opportunities and Baja's damages would be difficult to calculate. Because of lost contract opportunities, Baja maintains that it would suffer irreparable injury if injunctive relief were not granted. According to

Baja, the district court properly balanced the potential harms to each party and correctly found that Baja would suffer a greater injury than the City if injunctive relief were denied.

## IV

## Analysis

### A. *Standard of Review*

"In reviewing the decision of a district court to grant or deny a preliminary injunction, this court has continued to invoke the phrase 'abuse of discretion' in articulating the applicable standard." *Darryl H. v. Coler,* 801 F.2d 893, 897 (7th Cir.1986); *see also Chicago Bd. of Realtors, Inc. v. City of Chicago,* 819 F.2d 732, 735 (7th Cir. 1987). In deciding whether to afford injunctive relief, the district court must first make findings of fact and conclusions of law, and then exercise its discretion to grant or deny the injunction. This court reviews the findings of fact under the clearly erroneous standard; legal conclusions are given *de novo* review. *See Manbourne, Inc. v. Conrad,* 796 F.2d 884, 887 (7th Cir.1986); *Lawson Prod., Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1437 (7th Cir. 1986). "[A] factual or legal error may alone be sufficient to establish that the court 'abused its discretion' in making its final determination.... However, in the absence of such an error the district judge's weighing and balancing of the equities should be disturbed on appeal only in the rarest of cases." *Lawson Prod.,* 782 F.2d at 1437. However, while exercising his judgment, "the district judge must keep in mind that, while preliminary injunctions are an interlocutory form of relief, they are also 'an exercise of a very far-reaching power,' *Warner Bros. Pictures, Inc. v. Gittone,* 110 F.2d 292, 293 (3d Cir.1940) (per curiam), and, consequently, 'one in which the stakes are sufficiently high to make mistakes very costly.'" *Darryl H.,* 801 F.2d at 898 (quoting *Lawson Prod.,* 782 F.2d at 1433).[6] With these principles in mind, we review the district court's grant of a preliminary injunction.

---

**6.** Because the stakes involved in deciding whether to issue injunctive relief are high, this

court has stated that the district court must attempt to minimize errors.

## B. *The Requirements for the Issuance of a Preliminary Injunction*

As correctly stated by the parties and the district court, the plaintiff bears the burden of establishing five requirements necessary for the issuance of a preliminary injunction:

(1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) that it has a

reasonable likelihood of prevailing on the merits; and (5) that the injunction will not harm the public interest.

*Manbourne, Inc.,* 796 F.2d at 887; *Brunswick Corp. v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986). In this appeal, the district court and the parties have focused primarily on the requirement that Baja demonstrate a reasonable likelihood of success on the merits. We also believe that this element is the pivotal factor and therefore shall discuss it first.[7]

### 1. Likelihood of Success on the Merits

To establish a due process violation, Baja must show: "(1) a protected property or

---

[T]he task for the district judge in deciding whether to grant or deny a motion for preliminary injunction is to minimize errors: the error of denying an injunction to one who will in fact (though no one can know this for sure) go on to win the case on the merits, and the error of granting an injunction to one who will go on to lose. The judge must try to avoid the error that is more costly in the circumstances. That cost is a function of the gravity of the error if it occurs and the probability that it will occur. The error of denying an injunction to someone whose legal rights have in fact been infringed is thus more costly the greater the magnitude of the harm that the plaintiff will incur from the denial and the greater the probability that his legal rights really have been infringed. And similarly the error of granting an injunction to someone whose legal rights will turn out not to have been infringed is more costly the greater the magnitude of the harm to the defendant from the injunction and the smaller the likelihood that the plaintiff's rights really have been infringed.

*Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 388 (7th Cir.1984).

7. Although the parties did not raise this issue, we consider whether Baja failed to exhaust the available administrative remedies before filing for injunctive relief. Generally "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). However, the exhaustion requirement is "not inflexible, and must be applied with an understanding of its purposes and of the particular administrative scheme involved." *Atlantic Richfield Co. v. United States Dep't of Energy,* 769 F.2d 771, 781 (D.C.Cir.1984). "[W]hen resort to the agency would in all likelihood be futile, the cause of overall efficiency will not be served by postpon-

ing judicial review, and the exhaustion requirement need not be applied." *Id.* at 782.

In this case, Baja filed an appeal from the City's decision to the USDOT, but as of the date Baja filed for injunctive relief, the agency had not issued its decision on the appeal. Exhaustion is not required in this case, however, because it would be futile. First, a favorable decision on appeal to the USDOT would afford relief only for federally-funded contracts. As the section-by-section analysis of the USDOT regulations states, "once a recipient has made a final decision on certification, that determination goes into effect immediately *with respect to the recipient's DOT-assisted contracts* (see § 23.53(g))." 49 C.F.R. part 23, subpart D, app. A, at 150 (1986) (emphasis supplied). A favorable decision from the USDOT would not provide relief for contracts funded only by the City. *See Interstate Material Corp. v. City of Chicago,* 150 Ill.App.3d 944, 103 Ill.Dec. 593, 600, 501 N.E.2d 910, 917 (1986).

Further, an appeal to the USDOT would provide inadequate relief because the USDOT would not be able to stay the City's decision while the appeal was pending. The section-by-section analysis of the USDOT regulations provides that:

If a firm that has been denied certification or has been decertified appeals the recipient's action to the Department under § 23.55, ... the recipient's action remains in effect until and unless the Department makes a determination under § 23.55 reversing the recipient's action. The recipient's action is not stayed during the pendency [sic] of a § 23.55 appeal.

49 C.F.R. part 23, subpart D, app. A, at 150 (1986). Further, the regulations provide no time limitations during which the USDOT must issue its decision on the appeal. The appeal to the USDOT therefore provides inadequate relief because Baja would be denied MBE status and lose the concomitant advantage in competing for contracts for an indefinite period of time. Accordingly, we conclude that exhaustion is not required in this situation.

liberty interest, and (2) that [it] was deprived of that interest by government action and without due process of law." *Cunningham v. Adams,* 808 F.2d 815, 820 (11th Cir.1987).

### a. *Property Interest*

To establish that the City has violated its fourteenth amendment due process rights, Baja must first demonstrate that the City has deprived it of a property interest. The question of whether an individual has a property interest in a government benefit depends upon whether the person is entitled to that benefit. As the Supreme Court stated in *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972):

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.* at 577, 92 S.Ct. at 2709; *see also Reed v. Village of Shorewood,* 704 F.2d 943, 948 (7th Cir.1983) ("[P]roperty is what is securely and durably yours under state ... law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain.").[8]

■ Applying this analytical framework to the facts of this case, we must now decide whether the district court correctly decided that Baja has shown a reasonable likelihood of establishing a property interest in MBE certification as a concrete sup-

plier. The City's action in denying Baja MBE certification as a concrete supplier can be viewed in two ways: 1) as a more restrictive interpretation of its earlier grant of a general certification as an MBE, in effect, a partial decertification, or 2) as a denial of an application for certification under a different classification (concrete supplier as opposed to concrete contractor), in effect, a denial of a new benefit. The district court concluded that the first option was the correct one and that the City's actions were more appropriately characterized as a more restrictive interpretation of the earlier grant of certification. The district court found that, in initially applying for MBE certification, Baja "did not ... seek limited certification." Tr. of May 14, 1986 at 8. Further, the court found that there were no "water-tight compartments existing between concrete contractor and concrete supplier" and that the City's efforts to "dredge such water-tight compartments out of 49 CFR, Part 23 and the Small Business Administration Regulations are a kind of distortion of those documents, as well as of the place that those documents played and currently play in the certification structure and procedures." *Id.* The court concluded that "the City's later effort to limit the scope of the certification would constitute a deprivation of [Baja's] property interest." *Id.* at 15.

We cannot say that the district court abused its discretion in reaching this conclusion. To the extent that its conclusion is based on a factual determination as to the nature and extent of Baja's original application, its finding is not clearly erroneous. While the regulations are far from models of clarity and specificity, we cannot say, on the basis of our own study of those provisions, that the district court has misread them. Neither the USDOT regulations nor the Executive Order contain a list of certification classifications. While the City's Directory of Minority Business Enterprises

---

8. According to this concept of a property interest:

> [T]he applicable federal, state or local law which governs the dispensation of the benefit must define the interest in such a way that the individual should continue to receive it under

the terms of the law. This concept also seems to include a requirement that the person already has received the benefit or at least had a previously recognized claim of entitlement. 2 R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law* § 17.5, at 235 (1986).

labels each business according to its field of work, the absence of any provision in the USDOT regulations or in the Executive Order stating that MBE certification is limited to a particular line of work supports the district court's conclusion that MBE certification is not restricted in such a manner.[9]

Baja therefore has established a likelihood of showing that it has a protected property interest in MBE certification because the City had already conferred that benefit upon it.

### b. *What Process is Due*

The government may not deny a property interest without first giving the putative beneficiary an opportunity to present his claim of entitlement. "[I]t has become a truism that *'some* form of hearing' is required before the owner is finally deprived of a protected property interest." *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 433, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982) (quoting *Board of Regents,* 408 U.S. at 570–71 n. 8, 92 S.Ct. at 2705–06 n. 8)

**9.** The district court's finding that there were no written descriptions of various job classifications is supported by the testimony of Mr. Spieles, the City's Director of Contract Compliance.

Q. [Attorney] Do you know whether there's a difference between being a concrete contractor and a concrete supplier?
A. [Mr. Spieles] Yes, I do.
Q. How do you know the difference? What's the foundation for your knowledge that there is a difference?
A. I know what a concrete contractor does and I know what a concrete supplier does.
\* \* \* \*
Q. How do you know the difference between a concrete contractor and a concrete supplier?
A. I have reviewed a number of applications from a number of businesses in—who are concrete contractors. I've also reviewed a number of applications from concrete suppliers.
Tr. of May 5, 1986 at 53–54. Further, Mr. Spieles testified on cross-examination that the label applied to an MBE in the City's Directory describing its field of work is not selected from a comprehensive list of job classifications, but is provided after the business has been certified.

Q. And the categories that are included in that particular directory, those categories are not set up prior to the applicant's certification; isn't that correct?
A. That's correct.

(emphasis in original). "[W]hat is fundamentally fair in terms of the form and time of the notice and hearing must of necessity depend on circumstances that will vary from case to case." *Signet Constr. Corp. v. Borg,* 775 F.2d 486, 490 (2d Cir.1985). "In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985).

We begin by noting the limited, indeed focused, inquiry before us. Our task is not to determine whether the *entire* MBE review process employed by the City affords *all* businesses due process in *all* aspects of the administration of the program. Rather, our task is to determine whether, in the particular posture of this case, Baja was afforded due process when the City proposed to limit its MBE certification so as to exclude its operation as a concrete supplier.

■ Our review of the record reveals that Baja's application for certification as a

Q. For example, when a minority business enterprise applicant comes to the certification committee or to the Director of Purchasing and asked to be classified under the category Diversified Industrial, Commercial and Public Works, that wasn't a category that was set up before certification; is that right?
A. That's correct.
Tr. of May 5, 1986 at 92–93.
Further, the regulations and Executive Order do not vest the City with wide discretion in revoking MBE certification.
The City's program rules indicate to MBEs that they are entitled to the continuation of MBE certification so long as the firm continues to satisfy the City's uniform, enumerated standards. The Executive Order which establishes the City's MBE program sets forth specific criteria for MBE certification. (See City of Chicago Executive Order 85–2, sec. 1(b) (April 3, 1985); see also 49 C.F.R. sec. 23.53 (1985).) Once MBE certification is conferred by the City, this certification remains in full force and effect for an indefinite period of time, provided the firm continues to satisfy the City's specified criteria of what constitutes a "minority business enterprise." (See City of Chicago Executive Order 85–2, sec. 5(e) (April 3, 1985); see also 49 C.F.R. secs. 23.51, 23.53 (1985).)
*Interstate Material Corp.,* 103 Ill.Dec. at 598, 501 N.E.2d at 915.

concrete supplier (which, as we have noted above, amounted to an application to prevent partial decertification as an MBE) provided many of the procedural protections usually required before the loss of a protected property interest. The application that Baja completed specifically notified it that the provisions of 49 C.F.R. part 23 governed. *See* R.1, Ex. D at 2.[10] Those regulations, as we have noted above, specifically alerted the contractor that it could not function as a front for a non-minority business and still receive MBE certification. The Executive Order, while not as precise, contained the same requirement. Moreover, as we have already noted, Mr. Triplett, the City's on-site inspector, indicated to Baja that he was inspecting the site at O'Hare to determine whether Mr. Jaimes was running the operation himself. *See* Tr. of May 1, 1986 at 30.

The MBE Certification Committee reviewed Baja's application in early September 1985. During this meeting, the committee reviewed documents submitted by Baja and heard an oral report of the site inspection. The lease agreements submitted by Baja as part of its application indicated that the mixing plant and delivery trucks were leased on terms that prohibited their removal from the job site. Baja did renegotiate its lease with Material Service Corp. for the leasing of "redi-mix" trucks while its application with the City was pending. Unlike the earlier leases, this lease did not require the trucks to be used only at the O'Hare job site. The job site report indicated that Poulos supplied Baja with three of its workers and that a consultant from Material Service Corp. was in charge of quality control. After discussion, the committee voted unanimously to deny certification to Baja as a concrete supplier.

Baja was then notified of the committee's decision and the reason for the decision:

Your application and supporting documents does [sic] not indicate that your firm is an independently operated business. Relevant factors include the reliance upon Pavlos [sic] and Sons, Inc. and Material Service Corp. for personnel, technical assistance, leasing of concrete plant and equipment.

R.1, Ex. E.

Moreover, after this negative decision, Baja, through its attorney, had an opportunity to discuss the reasons for the denial and was afforded an opportunity to submit to City officials additional information. Indeed, on March 10, 1986, Baja's attorney filed a formal appeal with the City from the denial of certification. This request was granted by the City's Purchasing Agent. On March 24, 1986, Mr. Jaimes and Baja's attorney met with Mr. Grant, the City's Assistant Purchasing Agent, regarding Baja's appeal. At this meeting, Mr. Grant discussed the ownership of Baja's trucks, the source of the materials used to manufacture concrete and the number and ethnic background of Baja's employees. The reasons for the denial of the application as set forth in the September 9 letter also were discussed. Mr. Grant requested the submission of additional documents from Baja and stated that a second site visit would be scheduled. Tr. of May 2, 1986 at 65–66.

Mr. Wheaton, a compliance officer and an accountant, visited the work site during the week of April 7, 1986 and also reviewed Baja's purchase orders, invoices, tax returns, and billing practices. Mr. Wheaton also toured Baja's facilities and orally communicated his report to Mr. Bannister, the City's First Deputy Purchasing Agent (the report was later committed to writing). The report stated that Material Service Corp. served as the major source of materials purchased by Baja, that Material Service Corp. provided invoicing, billing, com-

---

10. The instructions at the top of the certification application, schedule A, provided:

Please fill out the form completely, the extensive information required is necessary to determine applicant's eligibility as a small business owned at least 51% by women or minorities (Black Americans [B] Hispanic Americans [H], Native Americans [N], Asian Americans [A]), or any other individuals found to be disadvantaged under the Small Business Act, and whose management and daily operation is controlled by such individuals (See 49 CFR Part 23.)

R.1, Ex. D at 2.

puterized invoice receipts and truck leasing services to Baja at no apparent cost, and that a Material Service Corp. employee mixed the raw materials. Mr. Wheaton concluded that Baja was an agent for Material Service Corp. Subsequently, Baja's attorney was informed in a telephone conversation that it was unlikely that Baja'a request for reconsideration would receive favorable treatment because no new material facts had been submitted since the application had been considered in September 1985.

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court established the basic analysis to be employed in determining, in terms of procedural due process, the adequacy of the administrative procedures employed by the government. Under *Mathews*, a court must assess the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903; *see also Brown v. McGarr*, 774 F.2d 777, 785 (7th Cir.1985).

Here, Baja's interest in certification as an MBE is substantial because of the increased potential for contract awards that MBE certification allows. Certainly, once granted, MBE certification is a valuable business asset. It gives the holder of the certification a significant competitive advantage in the market of government contracts. As noted by the Illinois Appellate Court in *Interstate Material Corp.*, 103 Ill.Dec. at 599, 501 N.E.2d at 916, "MBE certification is an extremely important asset to a minority business, and it is questionable whether a minority enterprise would be able to remain a viable competitor in its industry, if MBE certification is revoked."

The City's interest lies in ensuring that the businesses certified actually qualify for MBE status and are not serving as fronts for other non-minority owned corporations. Rather than competing, the potential MBE's interest and the City's interest converge, provided that the business actually satisfies the criteria for certification as an MBE. If the company is owned and operated by a member of a minority group, then it is in both the firm's interest and the City's interest for it to receive certification as an MBE to promote the goals underlying the MBE program. In this sense, both the applicant and the City would benefit from adequate procedures to ensure that bona fide MBEs receive certification and that MBEs serving as fronts are denied certification.

We believe that the City's procedures, *as applied in this case*, afforded Baja adequate protection against the risk of an erroneous deprivation of its property interest. From the beginning, Baja was on notice that, to function as an MBE, it could not operate as a front for a non-minority business. It had an opportunity, during the application process, to present evidence to show independent ownership and control. Indeed, at one point in the process, the City's on-site inspector, Mr. Triplett, specifically focused Baja's attention on this requirement. Baja was also informed, in no uncertain terms, of the reason for the City's action and was then given an opportunity to supply additional information. Under these circumstances, we cannot say that the procedures employed by the City presented, with respect to the issue of whether Baja was a front for a non-minority business, a significant risk of error.

We understand that the City's MBE review process, when viewed in its totality, was hardly the model of a well-constructed administrative process. The district court was of the view that some of the substantive criteria for evaluating applications were not well-established. The district court found that: "What's painfully clear from the testimony is that the rules, if they can be called that, are changing on a continuing basis. They are sort of being made up as the defendants go along." Tr. of

May 14, 1986 at 16–17. While there is some indication in the record that, in the absence of rules promulgated under the Executive Order, the City applied the criteria contained in the federal regulations, *see, e.g.,* tr. of May 5, 1986 at 185, the district court determined "that the Executive Order did not incorporate, as is now claimed, 49 CFR Part 23, as its rules and regulations. And ... the Executive Order required rules and regulations under its paragraph 3(i)." *Id.* at 18.

We need not determine, in any definitive way, whether the record supports these conclusions even under the highly deferential standard which we employ in reviewing factual findings. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Gianukos v. Loeb Rhodes & Co.,* 822 F.2d 648, 652 (7th Cir.1987). Rather, in our view, it is simply unnecessary, in this litigation, to address in such broad fashion the adequacy of *all* of the City's procedures. It is sufficient to determine that, with respect to whether Baja was operating as a front, the procedures employed were adequate to satisfy the demands of due process. Since the course followed by the City authorities in this case adequately reconciled the private and public interests involved and reduced to a minimum the possibility of an erroneous deprivation of Baja's property interest, the mandate of *Mathews* has been met.

### Conclusion

Because Baja was not deprived of due process of law by the action of the government, it was not entitled to a preliminary injunction. Accordingly, the judgment of the district court is reversed.

REVERSED.