In re Beverly A. STRAIGHT, doing business as Centerline Traffic Control & Flagging, Debtor.

Beverly A. Straight, doing business as Centerline Traffic Control & Flagging, Plaintiff–Appellee,

v.

Wyoming Department of Transportation, Defendant–Appellant.

New York County Lawyers' Association, Amicus Curiae.

BAP No. WY–99–020.
Bankruptcy No. 95–10007.
Adversary No. 96–1008.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

May 15, 2000.

Submitted on the briefs: * Gay Woodhouse, Attorney General, Martin L. Hardsocg, Assistant Attorney General, and Jennifer A. Golden, Senior Assistant Attorney General, Cheyenne, Wyoming, for Defendant–Appellant.

Stephen R. Winship of Winship & Winship, P.C., Casper, Wyoming, for Plaintiff–Appellee.

\* On December 15, 1999, the Court issued an order honoring the parties' request for a decision on the briefs without oral argument. *See* Fed. R. Bankr.P. 8012; 10th Cir. BAP L.R. 8012–1(a).

1. In a prior order, pursuant to 28 U.S.C. § 2403(a), the Court *sua sponte* directed the

Leonard H. Gerson of Angel & Frankel, P.C., New York City, for Amicus Curiae.

Before PUSATERI, BOULDEN, and ROBINSON, Bankruptcy Judges.

## OPINION

PUSATERI, Bankruptcy Judge.

Asserting a violation of its sovereign immunity, the Wyoming Department of Transportation ("the DOT") moved to dismiss an adversary proceeding filed against it by Beverley A. Straight ("Straight"), the Chapter 7 debtor. Straight's adversary proceeding seeks damages against the DOT resulting from the DOT's violation of 11 U.S.C. §§ 362(a) and 525(a) when it revoked Straight's "Disadvantaged Business Enterprise" ("DBE") certification solely because of Straight's bankruptcy filing. The bankruptcy court denied the DOT's motion to dismiss on the grounds that rulings in *Wyoming Dep't of Transp. v. Straight (In re Straight)*, 209 B.R. 540 (D.Wyo.1997), holding that the DOT's sovereign immunity in a related matter was validly abrogated under § 106(a) or waived under § 106(b), and *Wyoming Dep't of Transp. v. Straight (In re Straight)*, 143 F.3d 1387 (10th Cir.), *cert. denied*, 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998), affirming the district court's holding that the DOT waived its sovereign immunity under § 106(b), established the law of the case. We find the doctrine of law of the case to be inapplicable under the facts of this case, and conclude that § 106(a) is an unconstitutional attempt to abrogate Wyoming's sovereign immunity from Straight's adversary proceeding.[1] Consequently, the bankruptcy court's decision must be reversed.

Clerk of Court to certify to the United States Attorney General the constitutional question raised here about 11 U.S.C. § 106(a). The Attorney General has not intervened in this appeal.

## I. Background

### A. The Contempt and Fee Orders

Straight operated a highway flagging business known as "Centerline Traffic Control and Flagging" ("Centerline"). Centerline was certified by the DOT as a DBE. DBE certification entitled Centerline to bid for subcontracting jobs on federally-funded state highway projects in which general contractors obtain federal incentives for hiring DBE's. The DBE certification process is conducted through the DOT, and the DOT also lets construction bids.[2]

On January 13, 1995, Straight and her husband filed a petition under Chapter 13 of the Bankruptcy Code. The DOT received notice of the case. Although the DOT did not file a proof of claim, the Wyoming Department of Employment and the Wyoming Workers' Safety & Compensation Division ("the Other State Entities") filed proofs of claim that totaled about $30,000.

Shortly after Straight and her husband filed their Chapter 13 petition, the DOT recertified Centerline as a DBE. However, a few weeks later, the DOT sent a letter indicating it intended to decertify Centerline as a DBE because Straight had filed a Chapter 13 case and "lost the ability to control [her] business; that control now lies in the hands of the Bankruptcy Court and the Bankruptcy Trustee." The letter gave a short period to respond. Straight replied that the legal premise for the DOT's threat to decertify Centerline was incorrect, citing § 1304(b) of the Bankruptcy Code. The DOT proceeded to decertify Centerline as a DBE on March 28, 1995, claiming that Centerline was no longer eligible for DBE status under 49 C.F.R. § 23.53(a)(2) because Straight did not "possess the financial and bonding resources necessary to operate the business in its field of work." The notice of this action added that Straight had 180 days to

appeal the decision to the United States Department of Transportation.

The Straights filed a "Motion for Order to Show Cause and/or Contempt Citation," asserting that the DOT's decertification of Centerline as a DBE constituted a violation of the automatic stay under § 362(a) and the prohibition in § 525(a) against revoking Straight's property rights based solely on her bankruptcy filing. The bankruptcy court issued an order to show cause, scheduling a hearing on the matter for August 1995. The DOT did not appear at the hearing, but filed a written response to the motion and order that the court received later that day.

On September 20, 1995, the bankruptcy court issued an order on the Straights' motion ("the Contempt Order"), holding that the DOT's stated reason for revoking the DBE certification was mere pretext, and that the revocation violated §§ 362(a) and 525(a). The bankruptcy court ordered the DOT to reinstate Centerline as a DBE, awarded the Straights attorney's fees and costs, and ordered their attorney to serve on the DOT an itemization of the fees and costs incurred. The Contempt Order also stated: "[S]hould the [Straights] seek damages in addition to their attorney fees, they must file an adversary proceeding in accordance with Fed. R. Bankr.P. 7001." The Straights' attorney thereafter filed an itemization and served it on the DOT. The DOT did not object to the itemization, and on July 11, 1996, the bankruptcy court entered an order approving fees and costs of $1,949.94 ("the Fee Order").

### B. Appeal of the Fee Order

The DOT appealed the Fee Order to the United States District Court for the District of Wyoming, asserting a violation of its sovereign immunity. That court affirmed, finding that § 106(a) expressly abrogated the DOT's sovereign immunity for actions under §§ 362 and 525. *Wyoming*

---

**2.** For further description of the DBE program, *see Adarand Constructors, Inc. v. Slater,* —— U.S. ——, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000).

*Dep't of Transp. v. Straight (In re Straight)*, 209 B.R. 540 (D.Wyo.1997) (*"Straight I"*). In light of its analysis of *Seminole Tribe v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the court ruled that § 106(a) was constitutional. *Id.* at 546–555. Alternatively, the court held that the DOT's sovereign immunity had been waived under § 106(b) when the Other State Entities filed proofs of claim. *Id.* at 555–58.

The district court's order was affirmed by the United States Court of Appeals for the Tenth Circuit. *Wyoming Dep't of Transp. v. Straight (In re Straight)*, 143 F.3d 1387 (10th Cir.) (*"Straight II"*), *cert. denied*, 525 U.S. 982, 119 S.Ct. 446, 142 L.Ed.2d 400 (1998). The Tenth Circuit refused to address the constitutionality of § 106(a) and its application to the case, but affirmed on the ground that the DOT's sovereign immunity had been waived under § 106(b) as a result of the filing of the Other State Entities' proofs of claim, and that § 106(b) is constitutional. *Id.* at 1389–92.

### C. The Damages Suit

While the appeal of the Fee Order was pending, and in compliance with the bankruptcy court's directive in the Contempt Order, the Straights filed an adversary proceeding against the DOT ("the Damages Suit"). In it, they sought compensatory and punitive damages, plus attorney's fees and costs, based on contracts Straight claims she lost because the DOT revoked the DBE certificate, contracts that would allegedly have produced net profits of over $250,000. At some point, Straight's husband was dismissed from the suit. The DOT filed a motion to dismiss the complaint, declaring that "this Court has no jurisdiction to proceed against the [DOT] on the grounds and for the reason that the State is not a creditor of the [Straights]

nor has the State waived its sovereign immunity under the 11th Amendment to the United States Constitution."

At the DOT's request, the bankruptcy court postponed ruling on the motion to dismiss while the Fee Order appeal was pending. After the decision in *Straight II*, however, the bankruptcy court entered an order denying the DOT's motion. In that order, the bankruptcy court held that the decisions in *Straight I* and *Straight II* disposed of the DOT's claim of sovereign immunity, stating: "[T]he matter has effectively been resolved by the District Court's order of May 14, 1997 in the underlying bankruptcy case, which was affirmed by the Tenth Circuit Court of Appeals." The DOT timely appealed, bringing the dispute to us.

### D. Conversion of Straight's Chapter 13 case to Chapter 7

About three months after the filing of the Damages Suit, the bankruptcy court entered orders that bifurcated Straight's case from her husband's case, dismissed her husband's case, and converted her case to one under Chapter 7. No Chapter 13 plan of reorganization for either of the Straights was ever confirmed.

Neither the bankruptcy court's order denying the DOT's motion to dismiss the Damages Suit nor the briefs filed in this appeal addressed the conversion of Straight's case from Chapter 13 to Chapter 7, or the effect of that conversion on the issue of any waiver of the DOT's sovereign immunity under § 106(b). In supplemental briefing required by this Court, however, Straight admits that, pursuant to § 348(f)(1), the claim she asserts against the DOT in the Damages Suit is no longer property of the estate.[3]

---

3. The Court entered an order requiring the parties to file supplemental briefs addressing the effect of the conversion of Straight's case. In response, the New York County Lawyers' Association, an amicus curiae in this appeal, filed a supplemental brief. The DOT has moved to strike the supplemental brief, and the amicus curiae has filed an objection to the DOT's motion to strike. The motion to strike is denied.

## II. Appellate Jurisdiction

With the consent of the parties, this Court has jurisdiction to hear timely-filed appeals from "final judgments, orders, and decrees" of bankruptcy courts within the Tenth Circuit. 28 U.S.C. § 158(a)(1), (b)(1), and (c)(1); Fed. R. Bankr.P. 8002. This appeal is properly before us. The DOT timely filed a notice of appeal from the bankruptcy court's order, and the parties have consented to this Court hearing the appeal by failing to elect to have it heard by the district court. *Id.* § 158(c); Fed. R. Bankr.P. 8001; 10th Cir. BAP L.R. 8001–1. In a prior order, this Court determined the order appealed is a final order under the collateral order doctrine.

## III. Standard of Review

■ "For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo*), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion')." *Pierce v. Underwood,* 487 U.S. 552, 558, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988); *see* Fed. R. Bankr.P. 8013; *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1370 (10th Cir.

1996). The bankruptcy court's order refusing to dismiss the Damages Suit based on the preclusive effect of *Straight I* and *Straight II* is reviewed *de novo. See, e.g., State Bank v. Gledhill (In re Gledhill),* 76 F.3d 1070, 1082 (10th Cir.1996) (applicability of preclusive doctrines reviewed *de novo* ); *United States v. Lacey,* 982 F.2d 410, 411 (10th Cir.1992) (preclusive effect of prior judgment reviewed *de novo* ); *see also Straight II,* 143 F.3d at 1387 (applying *de novo* review to sovereign immunity holding).

## IV. Discussion

Contrary to the bankruptcy court's ruling, we conclude that neither *Straight I* nor *Straight II* establishes the law of the case for the Damages Suit, and therefore they are not binding on the issues of waiver or the constitutionality of § 106(a). The DOT has not waived its sovereign immunity in the Damages Suit under § 106(b) or common law. Furthermore, because § 106(a) is an unconstitutional attempt to abrogate the DOT's sovereign immunity from the Damages Suit,[4] the bankruptcy court's order refusing to dismiss the Damages Suit is reversed.

---

4. The States' sovereign (or "Eleventh Amendment") immunity protects them from a "suit." Recent case law indicates that courts are struggling to define "suit" in a bankruptcy context when sovereign immunity is at issue. *See Virginia v. Collins (In re Collins),* 173 F.3d 924 (4th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 785, 145 L.Ed.2d 663 (2000) (finding that a motion to reopen and determine that a debt was discharged was not a "suit" against a state that implicated the Eleventh Amendment); *Maryland v. Antonelli Creditors' Liquidating Trust,* 123 F.3d 777 (4th Cir.1997) (a confirmation order was not a "suit" against the state); *University of Va. v. Robertson,* 243 B.R. 657, 662–65 (W.D.Va.2000) (concluding that an adversary proceeding to determine the dischargeability of a student loan was a "suit" as contemplated by the Eleventh Amendment); *accord Pitts v. Ohio Dep't of Taxation (In re Pitts),* 241 B.R. 862, 869–70 (Bankr.N.D.Ohio 1999) (applying a six-factor test to determine if the substance of the underlying action constituted a "suit" for Eleventh Amendment purposes, and finding

lien avoidance and dischargeability actions to be a "suit"); *In re Barrett Refining Corp.,* 221 B.R. 795, 801–08 (Bankr.W.D.Okla.1998) (bankruptcy cases are not "suits" covered by Eleventh Amendment).

The bankruptcy court ruled that if Straight wanted monetary damages from the DOT, an adversary proceeding would be necessary under Fed. R. Bankr.P. 7001. We conclude that the Damages Suit—filed in accord with the bankruptcy court's instruction, naming the DOT as a defendant, serving it with process summoning it to appear before the bankruptcy court, and seeking the recovery of money from it—is an "action asking the court to take away an asset presently in the state's possession," and implicates the Eleventh Amendment. *Robertson,* 243 B.R. at 662–65 (when a debtor asks, by motion or adversary proceeding, that a federal court dispossess a State of an asset presently in its possession, or when an adversary proceeding asks a court to prevent the State from receiving possession of an asset in the estate's possession, the Eleventh Amendment applies).

### A. The law of the case doctrine

 In the Tenth Circuit, the law of the case doctrine is defined as follows:

Issues decided on appeal become the law of the case and are to be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court, "unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice."

*Woods v. Kenan (In re Woods)*, 215 B.R. 623, 625 (10th Cir. BAP 1998) (quoting *White v. Murtha*, 377 F.2d 428, 431–32 (5th Cir.), *reh'g denied*, 381 F.2d 34 (5th Cir.1967)), *aff'd*, 173 F.3d 770 (10th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 187, 145 L.Ed.2d 157 (1999). The doctrine does not apply " 'unless an appellate decision has issued on the merits of the claim sought to be precluded.' " *Mitchell v. Maynard*, 80 F.3d 1433, 1448 (10th Cir. 1996) (quoting *Wilmer v. Board of County Comm'rs*, 69 F.3d 406, 409 (10th Cir. 1995)); *accord Octagon Resources, Inc. v. Bonnett Resources Corp. (In re Meridian Reserve, Inc.)*, 87 F.3d 406, 410 (10th Cir. 1996). An earlier decision, therefore, will not apply to a later matter in related litigation if the later claim, although premised on similar facts, is based on different evidence or admissions. *See, e.g., Meridian Reserve*, 87 F.3d at 410 (doctrine does not apply where previous ruling was made in different context, involving different considerations); *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9*, 10 F.3d 700, 706 (10th Cir.1993) (doctrine does not ap-

ply if earlier matter is "factually distinct"), *modified on other grounds on rehearing en banc*, 39 F.3d 1078 (10th Cir.1994), *cert. denied*, 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995). This is particularly true in bankruptcy, where a "case" may involve a series of distinct adversary proceedings or contested matters, each involving a similar set of facts, but different claims based on different evidence.

### ˙ B. Straight I and Straight II

An analysis of the application of the law of the case doctrine in this case requires that we review the holdings in *Straight I* and *Straight II*. In *Straight I*, the DOT argued that sovereign immunity barred the bankruptcy court's Fee Order. The district court rejected this contention, holding that § 106(a) abrogated the DOT's sovereign immunity, and was constitutional under *Seminole Tribe*. *Straight I*, 209 B.R. at 546–55. Alternatively, the district court held that the Other State Entities' proofs of claim served as a waiver of the DOT's sovereign immunity under § 106(b). *Id.* at 555–58.

*Straight II*, 143 F.3d at 1389, affirmed the district court's § 106(b) ruling only, concluding that the constitutionality of § 106(a) need not be addressed because the DOT's immunity had been waived under § 106(b).[5] To determine whether § 106(b) applies, the Tenth Circuit said the following questions must be answered:

1) What is a "governmental unit" and does Wyoming fit that definition in this case; 2) if so, has the Debtor asserted a claim against Wyoming that is "property of the estate"; 3) did that claim arise "from the same transaction or occur-

---

5. Section 106(b) states:

> A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

11 U.S.C. § 106(b). Some courts have held that § 106(b) is unconstitutional under *Seminole Tribe*. *See, e.g., Schlossberg v. Maryland Comptroller of the Treasury (In re Creative Goldsmiths of Washington, D.C., Inc.)*, 119 F.3d 1140, 1147 (4th Cir.1997), *cert. denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). In *Straight II*, 143 F.3d at 1392, however, the Tenth Circuit held that § 106(b) is constitutional.

rence" as the proofs of claim previously filed by the State?

*Id.* at 1390. Answering these questions, the Circuit first held that the DOT was a "governmental unit" as that term is defined in § 101(27). *Straight II,* 143 F.3d at 1390–91. The DOT and the Other State Entities, also "governmental units," were all parts of the State of Wyoming, which should be regarded in bankruptcy as one unified entity. *Id.* Therefore, the Other State Entities' proofs of claim applied to all of Wyoming's agencies for purposes of § 106(b). *Id.*

The Tenth Circuit also held that the claim Straight was asserting against the DOT was "property of the estate," stating:

> That leads us to consideration of whether Ms. Straight has asserted a claim against Wyoming that is property of the estate. Although one might expect that claims of this nature are normally for money damages, the action before us *at this time* seeks a recovery that is not essentially monetary. In filing her motion to show cause and for contempt, Ms. Straight ... initially sought the restoration of the certificate she owned prior to bankruptcy that was essential to the conduct of her postpetition business. Without that certificate, she could not conduct her affairs as a flagging contractor, nor could she effect a Chapter 13 plan. We believe, therefore, there can be no doubt that in this quest the Debtor was in every sense seeking the return of property of the estate as that concept is broadly defined in 11 U.S.C. § 541(a)(1).

*Id.* at 1391 (emphasis added).

Finally, answering the third question, the Circuit concluded that the claim asserted against the DOT arose from the "same transaction or occurrence" as the Other State Entities' proofs of claim. *Id.* at 1391–92. The Circuit held that those proofs of claim, which asserted claims related to Straight's operation of Centerline, were linked to the DOT's decertification of Centerline as a DBE, which was what

prompted Straight to seek a contempt order against the DOT. *Id.* at 1391. Since both the proofs of claim and the contempt allegations arose from Straight's business, the Tenth Circuit concluded that the respective claims arose from the same transaction or occurrence. *Id.* at 1392.

## C. *Straight II is not the law of the case in the Damages Suit*

■ Applying the law of the case doctrine to issues of waiver under § 106(b) in this appeal, we conclude that *Straight II* is not binding in the Damages Suit. Unlike Straight's claim against the DOT in *Straight II,* the claim asserted by Straight in the Damages Suit is not, by the parties' admissions and applicable law, "property of the estate." This element of § 106(b) not being met, we need not address whether *Straight II* is the law of the case on the other two elements of the test the Tenth Circuit applied under § 106(b).

■ Section 106(b) requires that a debtor's claim against a governmental unit be "property of the estate" as that term is defined in the Bankruptcy Code. 11 U.S.C. § 106(b); *Straight II,* 143 F.3d at 1390–91. *Straight II* held that Straight's claim against the DOT in the Fee Order appeal was property of the estate under § 541(a)(1) because she was seeking "restoration of the certificate she owned prior to bankruptcy that was essential to the conduct of her postpetition business." *Id.* at 1391. The modest attorney fees at issue were only incidental to the claim in the Fee Order appeal, which *Straight II* determined was "not essentially monetary." *Id.* It elaborated that "[w]ithout that certificate, [Straight] could not conduct her affairs as a flagging contractor, nor could she effect a Chapter 13 plan." *Id.* Based on this premise, the Tenth Circuit held that "there can be no doubt that in this quest [Straight] was in every sense seeking the return of property of the estate as that concept is broadly defined in 11 U.S.C. § 541(a)(1)." *Id.*

Straight's claim against the DOT in the Damages Suit is a postpetition cause of action, seeking damages based on contracts that Straight asserts: (1) were obtained by her business postpetition; (2) would have produced net profits of over $250,000; and (3) were lost because the DOT violated §§ 362(a) and 525(a). The parties agree that Straight's claim against the DOT in the Damages Suit is not property of the Chapter 7 estate. Straight's position, expressed in her Supplemental Brief, is that any recovery she receives in the Damages Suit is not property of the estate, but is hers alone.

Straight's position is supported by application of the express terms of the Bankruptcy Code. While her claim against the DOT could be viewed as property of the estate under § 1306(a),[6] that section no longer applies because Straight's Chapter 13 case has been converted to Chapter 7. Pursuant to § 348(f)(1), when Straight's case was converted to Chapter 7, the Chapter 7 estate consisted of the property still in her possession or control that was property of the estate as of the date she originally filed for bankruptcy.[7] Since the claim asserted in the Damages Suit did not even exist on the petition date, it is not property of the Chapter 7 estate.

Because (1) the parties agree that Straight's claim against the DOT in the Damages Suit is not property of the estate, and (2) this agreement is consistent with the plain language of § 348(f), this case is factually distinguishable from *Straight II*. The application of § 106(b) to the Fee

Order in *Straight II*, therefore, is not binding as law of the case in the Damages Suit.

### D. Common law waiver is inapplicable in the Damages Suit

Since § 106(b) was held to apply in the Fee Order appeal, the district court and the Tenth Circuit were not required in *Straight I* or *Straight II* to address whether the DOT had waived its sovereign immunity under common law rules of waiver. As § 106(b) does not apply in the Damages Suit, we must examine whether common law waiver applies, prior to an analysis of whether § 106(a) is constitutional. *See, e.g., Greater New Orleans Broadcasting Ass'n v. United States*, 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) ("[W]e do not ordinarily reach out to make novel or unnecessarily broad pronouncements on constitutional issues when a case can be fully resolved on a narrower ground."); *Clinton v. Jones*, 520 U.S. 681, 690, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) ("'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable.'" (quoting *Rescue Army v. Municipal Court*, 331 U.S. 549, 570 n. 34, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); further internal quotations omitted)); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 7, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993) (courts should not pass on constitutionality of Act of Congress if constitutional issue

---

**6.** In a Chapter 13 case, "property of the estate" includes property "that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, 11, or 12 of this title, whichever occurs first." 11 U.S.C. § 1306(a).

**7.** Section 348(f)(1)(A) provides:
(f)(1) Except as provided in paragraph (2), when a case under chapter 13 of this title is converted to a case under another chapter under this title—
 (A) property of the estate in the converted case shall consist of property of the

estate, as of the date of filing of the petition, that remains in the possession of or is under the control of the debtor on the date of conversion....
11 U.S.C. § 348(f)(1)(A). Paragraph (2) of § 348(f) creates a bad faith exception, stating that if a debtor converts a case under Chapter 13 to a case under a different Chapter in bad faith, the property in the converted case shall consist of the property of the estate as of the date of conversion. There has been no allegation that Straight's case was converted in bad faith.

can be avoided (citing cases)). For the reasons set forth below, we hold that the DOT's sovereign immunity has not been waived under common law rules of waiver.

■ The Supreme Court has indicated that: "A State may effectuate a waiver of its constitutional immunity by a state statute or constitutional provision, or by otherwise waiving its immunity to suit in the context of a particular federal program." *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 n. 1, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), *quoted in Innes v. Kansas State Univ. (In re Innes),* 184 F.3d 1275, 1278 (10th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1530, 146 L.Ed.2d 345 (2000). The Tenth Circuit's recent application of common law waiver of sovereign immunity in bankruptcy compels an inquiry into the doctrine's applicability in the present appeal, where the underlying events implicate a federal program. *See Innes,* 184 F.3d at 1278–81 (without mentioning § 106(b), Tenth Circuit held that Kansas waived immunity in dischargeability action by participating in federal program mandating compliance with bankruptcy laws); *Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947) (bankruptcy court may entertain objections to State's proof of claim despite assertion of sovereign immunity); *Rose v. United States Dep't of Educ. (In re Rose),* 187 F.3d 926 (8th Cir.1999) (relying on common law principle set forth in *Gardner* that submission of proof of claim in bankruptcy waives immunity); *Georgia Dep't of Revenue v. Burke (In re Burke),* 146 F.3d 1313 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 2410, 144 L.Ed.2d 808 (1999) (applying *Gardner,* not § 106(b)).

■ Common law waiver is narrow in scope. It "require[s] an unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Atascadero,* 473 U.S. at 241, 105 S.Ct. 3142, *quoted in Innes,* 184 F.3d at 1278; *see College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999) (*"College Savings"*); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). "The test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Atascadero,* 473 U.S. at 241, 105 S.Ct. 3142. "A waiver of Eleventh Amendment immunity will be found 'only where stated by the most expressive language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.'" *Innes,* 184 F.3d at 1278 (quoting *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (internal quotation omitted)). Even if a State's constitution or statute waives immunity in its own courts, such a waiver is insufficient to waive its immunity in federal court. *College Savings,* 119 S.Ct. at 2226; *Atascadero,* 473 U.S. at 241, 105 S.Ct. 3142; *Innes,* 184 F.3d at 1279. Furthermore, a sovereign's consent to be sued "'must be construed strictly in favor of the sovereign.'" *Nordic Village,* 503 U.S. at 34, 112 S.Ct. 1011 (quoting *McMahon v. United States,* 342 U.S. 25, 27, 72 S.Ct. 17, 96 L.Ed. 26 (1951)).

Wyoming has not waived its immunity in federal actions by constitutional provision or statute. The Wyoming Constitution provides that "[s]uits may be brought against the state in such manner and in such courts as the legislature may by law direct." Wyo. Const. art. 1, § 8. Wyo. Stat. Ann. § 1–35–101 declares that actions against the State may only be maintained in state courts. *See Williams v. Eaton,* 443 F.2d 422 (10th Cir.1971) (immunity is waived in Wyoming only for actions in state courts, not federal courts).

■ The DOT also has not waived its immunity by participating in the DBE program, which is administered, in part, by the United States Secretary of Transportation. The federal regulations implementing the DBE program in no way re-

**414**

quire a waiver of a participating State's sovereign immunity. *See* 49 C.F.R. subtit. A, pt. 23, subpt. F (1998). While the Tenth Circuit held in *Innes*, 184 F.3d at 1280–81, that a State's participation in a federal program that requires adherence to bankruptcy law is sufficient to effect a waiver of sovereign immunity, the applicable federal regulations in this case, unlike those in *Innes*,[8] do not mention bankruptcy. *See* 49 C.F.R. subtit. A, pt. 23, subpt. F.

 Finally, although some courts have held that a State's active participation in a case or its filing of a proof of claim waives the State's immunity as to all matters in the case,[9] we do not adopt this position because it would render § 106(b) useless, and run counter to the Supreme Court's insistence on strictly construing waivers of sovereign immunity. *See Nordic Village*, 503 U.S. at 34, 112 S.Ct. 1011. *See also United States v. Murdock Mach. & Eng'g Co.*, 81 F.3d 922 (10th Cir.1996) (under Bankruptcy Act, which did not contain waiver of sovereign immunity provision similar to § 106, United States was immune from suit related to automatic stay despite fact it had filed proof of claim; court makes clear that filing proof of claim did not waive immunity of United States in general).

*E. The constitutional ruling in Straight I is not law of the case*

Having found § 106(b) waiver and common law waiver inapplicable to the Damages Suit, we are faced squarely with the issue of whether the DOT's sovereign immunity has been validly abrogated by § 106(a). The bankruptcy court determined that it was bound by the district court's decision in *Straight I*, which held, in part, that § 106(a) is constitutional. *See Straight I*, 209 B.R. at 546–55. We conclude that *Straight I* is not binding as the law of the case in the Damages Suit.

 As discussed above, the law of the case doctrine requires that "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), *quoted in Stifel, Nicolaus & Co. v. Woolsey & Co.*, 81 F.3d 1540, 1543 (10th Cir.1996). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], at 118 (1984)). At first blush, the doctrine would appear to apply in this case to the district court's constitutional analysis of § 106(a).

 Certain exceptions to the law of the case doctrine, however, prevent its application in this case. First, the law of the case doctrine does not apply to dictum. *Meridian Reserve*, 87 F.3d at 410; 18 J. Moore, *Moore's Federal Practice* § 134.21[2] & n. 3 (3d ed.1999) (citing several cases) [hereafter *"Moore's"*]. In *Straight II*, the Tenth Circuit effectively ruled that the constitutional ruling in *Straight I* was dictum, because that matter

**8.** In *Innes*, Kansas's participation in a federal student loan program required it to perform certain actions in the event that a borrower filed bankruptcy, including staying its collection of a debt in accordance with § 362, filing a proof of claim, and, if the debtor filed a complaint seeking a hardship discharge under § 523(a)(8), investigating the debtor's claim and defending against the complaint if appropriate. *Innes*, 184 F.3d at 1282.

**9.** *See, e.g., In re Fennelly*, 212 B.R. 61, 64 (D.N.J.1997) (regardless of § 106, state consents to be sued in federal court by filing proof of claim); *accord Ossen v. Connecticut Dep't of Soc. Servs. (In re Charter Oaks Assocs.)*, 203 B.R. 17, 22 (Bankr.D.Conn.1996); *Burke v. Georgia (In re Burke)*, 200 B.R. 282, 287 (Bankr.S.D.Ga.1996), *aff'd*, 146 F.3d 1313 (11th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 2410, 144 L.Ed.2d 808 (1999); *In re Barrett Refining Corp.* 221 B.R. 795, 810 (Bankr.W.D.Okla.1998).

was properly decided under § 106(b). *See Straight II,* 143 F.3d at 1389 and 1392. Second, the law of the case doctrine is also inapplicable if there has been a change in the law, either due to a statutory change or a decision by a higher court. *Moore's,* § 134.21[3]; *Stifel,* 81 F.3d at 1544. Since *Straight I* was decided, the Supreme Court has handed down five cases that establish that the district court's constitutional analysis was incorrect. *Kimel v. Florida Bd. of Regents,* — U.S. —, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (*"Florida Prepaid"*); *College Savings,* 527 U.S. 666, 119 S.Ct. 2219; *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999); *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (addressing Congress' power to enforce Fourteenth Amendment, but not States' sovereign immunity). Because these exceptions to the law of the case doctrine apply, *Straight I* is not binding, and we must examine the constitutionality of § 106(a) *de novo.*

*F. The constitutionality of § 106(a)*

■ In *Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240, 2246–47, 144 L.Ed.2d 636 (1999), the Supreme Court explained that although it had sometimes referred to the States' sovereign immunity as "Eleventh Amendment immunity," the immunity actually does not derive from that Amendment. Instead, it is a fundamental aspect of the immunity the States enjoyed before the ratification of the Constitution, and includes all that immunity except to the extent the States were required to surrender it as part of the constitutional design or under subsequent Amendments to the Constitution. Except for the waiver-by-filing-proof-of-claim theories we have rejected above, no claim is made here that Wyoming's immunity from the Damages Suit has been affected in any way except by Congress' enactment of § 106(a). In a series of decisions beginning with *Semi-*

*nole Tribe,* the Court has made clear that Congress has only limited authority to abrogate the States' immunity by statutes similar to § 106(a). *See Seminole Tribe; Alden; College Savings; Florida Prepaid; Kimel.*

The DOT asserts that § 106(a) is not a valid abrogation of Wyoming's sovereign immunity. Section 106(a) provides in part:

Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

The four succeeding subsections of § 106(a) further define various aspects of this abrogation. For example, subsection (3) specifies that money recoveries are authorized but that punitive damages are not. In the Damages Suit, Straight asked for punitive damages, so this provision bars that aspect of her claim.

The parameters of a valid abrogation of sovereign immunity are limited. According to *Seminole Tribe,* a statute attempting to abrogate the States' sovereign immunity will pass constitutional muster only if two questions can be answered, "Yes": "first, whether Congress has 'unequivocally expresse[d] its intent to abrogate the immunity,' *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985); and second, whether Congress has acted 'pursuant to a valid exercise of power,' *ibid.*" 517 U.S. at 55, 116 S.Ct. 1114 (alteration in original).

*1. Section 106(a) is an unequivocal expression of intent to abrogate the States' sovereign immunity*

Section 106(a) clearly meets the "unequivocal intent to abrogate" test. It pro-

vides that "sovereign immunity is abrogated as to a governmental unit ... with respect to" a list of sixty sections of the Bankruptcy Code, and that "[t]he court may hear and determine any issue arising with respect to the application of such sections to governmental units." 11 U.S.C. § 106(a)(1) & (2). It also authorizes the bankruptcy court to "issue against a governmental unit an order, process, or judgment under such sections ..., including an order or judgment awarding a money recovery." *Id.* § 106(a)(3). The term "governmental unit" means a "State" and a "department, agency, or instrumentality of ... a State." *Id.* § 101(27).

Thus, in § 106(a), Congress has made its intention to abrogate the States' sovereign immunity " 'unmistakably clear in the language of the statute.' " *Seminole,* 517 U.S. at 56, 116 S.Ct. 1114 (quoting *Dellmuth v. Muth,* 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989)); *see also Sacred Heart Hosp. v. Pennsylvania Dep't of Pub. Welfare (In re Sacred Heart Hosp.),* 133 F.3d 237, 243 (3d Cir.1998) (in enacting § 106(a), Congress unequivocally expressed its intent to abrogate the States' Eleventh Amendment immunity); *accord Schlossberg v. Maryland Comptroller of the Treasury (In re Creative Goldsmiths of Washington, D.C., Inc.),* 119 F.3d 1140, 1145 (4th Cir.1997), *cert. denied,* 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). The DOT does not dispute that it is a "governmental unit" to which § 106(a) applies. Consequently, if § 106(a) was enacted pursuant to a valid exercise of power, it validly abrogates the DOT's sovereign immunity.

2. *Section 106(a) was not enacted pursuant to a valid exercise of power if premised on art. I, § 8 of the Constitution*

In *Seminole Tribe,* the Supreme Court ruled that Congress could not use its power under the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, to abrogate

the immunity of unconsenting States from suits by private parties in federal courts. 517 U.S. at 57–73, 116 S.Ct. 1114. The Court overruled the decision of *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 19–20, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), which had upheld abrogation pursuant to the Interstate Commerce Clause. *Id.* at 61–66, 109 S.Ct. 2273. Since then, the Court has declared that *Seminole Tribe* means that none of Congress' powers under article I of the Constitution will support an attempt to abrogate the States' sovereign immunity. *Alden v. Maine,* 527 U.S. 706, ——, 119 S.Ct. 2240, 2246, 144 L.Ed.2d 636 (1999); *Florida Prepaid,* 527 U.S. at ——, 119 S.Ct. at 2205. After these decisions, it is clear that Congress' article I power "To establish ... uniform Laws on the subject of Bankruptcies throughout the United States" does not include the power to abrogate the States' sovereign immunity. U.S. Const. art. I, § 8, cl. 4.

3. *Considered as a whole, § 106(a) was not enacted pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment of the Constitution*

■ Congress may abrogate the States' sovereign immunity under § 5 of the Fourteenth Amendment. *Kimel,* 120 S.Ct. at 644; *Alden,* 119 S.Ct. at 2267; *College Savings,* 119 S.Ct. at 2223; *Florida Prepaid,* 119 S.Ct. at 2205; *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114. This provision empowers Congress "to enforce" with "appropriate legislation" the guarantees set forth in § 1 of the Fourteenth Amendment: namely, that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." [10] We next consider, therefore, whether Congress properly enacted § 106(a) pursuant to its power to enforce that Amendment.

---

**10.** Congress has a similar power under the Thirteenth Amendment, which abolished slavery, and the Fifteenth Amendment, which

protects the right to vote. *See* U.S. Const. amend. XIII, § 2 & amend. XV, § 2. The rights they secure, however, have little if any

So far as we have found, all the Circuit court decisions considering the question since *Seminole Tribe* was decided have ruled that § 106(a) cannot be interpreted to have resulted from an exercise of Congress' power to enforce the Fourteenth Amendment. *See Sacred Heart Hosp. v. Pennsylvania Dep't of Pub. Welfare (In re Sacred Heart Hosp.)*, 133 F.3d 237, 243–44 (3d Cir.1998); *Department of Transp. & Dev. v. PNL Asset Management Co. LLC (In re Fernandez)*, 123 F.3d 241, 245 (5th Cir.1997), *amended on different point*, 130 F.3d 1138; *Schlossberg v. Maryland Comptroller of the Treasury (In re Creative Goldsmiths of Washington, D.C., Inc.)*, 119 F.3d 1140, 1146–47 (4th Cir. 1997), *cert. denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). We agree with these courts that the full reach of § 106(a) cannot be considered to have been aimed at preventing the States from violating the Fourteenth Amendment. For example, many of the provisions § 106(a) makes applicable to the States concern only, or at least mainly, types of relief made available to a trustee or debtor-in-possession in a bankruptcy case without regard to any action that might have been taken by a State. (These include § 363 on the use, sale, or lease of property, § 364 on obtaining postpetition credit, and § 365 on executory contracts and unexpired leases.) Another provision listed in § 106(a), § 547, would authorize the recovery of preferences from the States, and preferences require absolutely no wrongdoing by the parties from whom they may be recovered.

4. *Even considered only in connection with §§ 362(a) or 525(a), § 106(a) was not enacted pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment of the Constitution*

■ The dissent suggests that the validity of § 106(a) must be evaluated separately for each of the sixty Bankruptcy Code provisions listed in it. Such a separate analysis of the Code provisions referenced in § 106(a) would honor the maxim of statutory construction that allows for an unconstitutional provision to be severed in order to save the balance of the statute. In *Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the Court noted the standard for determining the severability of an unconstitutional provision: " 'Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " (quoting *Champlin Refining Co. v. Corporation Comm'n*, 286 U.S. 210, 234, 52 S.Ct. 559, 76 L.Ed. 1062 (1932)). It should be noted that Congress indicated its intent that unconstitutional provisions be severed when it included a severability provision in the Bankruptcy Reform Act of 1994, the Act that amended § 106 into its present form.[11]

Yet even taking the approach of considering the abrogation of the States' immunity only in connection with the specific provisions the debtor contends were violated in this case, §§ 362(a) and 525(a), we cannot agree that Congress had the authority under the Fourteenth Amendment to subject unconsenting States to private parties' suits based on those provisions. Recent Supreme Court decisions make that view untenable.

Since *Seminole Tribe*, the Supreme Court has decided a number of cases concerning Congress' power to enforce the Fourteenth Amendment. In the first, *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), a church alleged that a religiously-neutral state law

impact on bankruptcy, and could not even arguably support the sovereign immunity abrogation found in § 106(a).

11. See Pub.L. No. 103–394, §§ 701 & 113 (Oct. 22, 1994), 108 Stat. 4106, 4150 & 4117–18.

of general applicability violated the Religious Freedom Restoration Act of 1993 (RFRA) by infringing on the church's free exercise of its religion. As the case came to the Court, the question was whether RFRA was a constitutional use of Congress' power to enforce the Fourteenth Amendment. The Court concluded RFRA did not merely enforce the Due Process or Equal Protection Clauses of the Amendment, but instead exceeded Congress' authority because it sought to change what the rights protected by those Clauses were. *Id.* at 531–32, 117 S.Ct. 2157. The Court indicated that the remedial, rather than substantive, basis of Congress' power requires there to be "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520, 117 S.Ct. 2157. The Court noted that the legislative record of the RFRA lacked examples of modern instances of generally applicable laws passed because of religious bigotry. *Id.* at 529–31, 117 S.Ct. 2157. But RFRA's major problem was that it attempted to make a substantive change in constitutional protections. *Id.* at 531–35, 117 S.Ct. 2157. Although the decision did not involve a Congressional attempt to abrogate the States' immunity, it provided an analytical framework for subsequent cases that did.

In the summer of 1999, the Court decided two cases directly involving Congressional attempts to abrogate the States' sovereign immunity that were claimed to be permissible exercises of its Fourteenth Amendment enforcement power. The Court found both attempts to be invalid. In one of the cases, *College Savings Bank,* 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999), the Court ruled that property rights allegedly being protected under the Trademark Remedy Clarification Act were not property rights protected by the Due Process Clause of the Fourteenth Amendment. *Id.* at ——, 119 S.Ct. at 2224–25. Consequently, the Act could not constitutionally abrogate the States' immunity in order to protect those rights. *Id.*

The second case more significantly influences our analysis in this case, and requires a more extensive description. In it, *Florida Prepaid,* 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999), the Court indicated that the abrogation attempted in the Patent and Plant Variety Protection Remedy Clarification Act was not permissible because Congress had failed to identify any pattern of patent infringement by the States, much less a pattern of unremedied patent infringement. *Id.* at ——, 119 S.Ct. at 2207. In order to violate the Due Process Clause of the Fourteenth Amendment, the Court said, the States would not only have to invade patent rights, but also use sovereign immunity to deny patent owners compensation for those invasions. *Id. City of Boerne,* the Court said, declared "that for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." *Id.* Because of the limited record of constitutional violations by the States, Congress' failure to restrict the Act's application to the States to cases involving arguable constitutional violations rendered it so out of proportion to a supposed remedial or preventive object that it cannot be understood to be in response to or designed to prevent unconstitutional behavior. *Id.* at ——, 119 S.Ct. at 2210–11. Instead, the Act appears to have been intended to provide a uniform remedy for patent infringement and to place the States on the same footing as private parties under federal patent law. *Id.* at ——, 119 S.Ct. at 2211. These are proper Article I concerns, but the Article I powers cannot support the abrogation attempted in the Act. *Id.*

More recently, in *Kimel v. Florida Board of Regents,* —— U.S. ——, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), the Court ruled that the abrogation of the States' immunity found in the Age Discrimination in Employment Act (ADEA) also exceeded

Congress' § 5 enforcement power. The Equal Protection Clause of the Fourteenth Amendment prohibits States from using age classifications that are not rationally related to a legitimate state interest. *Id.*, 120 S.Ct. at 645–47. The ADEA prohibited substantially more state employment decisions and practices than would likely be held unconstitutional under the rational basis equal protection standard, and the legislative record did not show that Congress had uncovered evidence of a pattern of unconstitutional age discrimination by the States. *Id.*, 120 S.Ct. at 647–49. These two shortcomings made the attempted abrogation invalid. *Id.*, 120 S.Ct. at 649.

These cases indicate that only a history of constitutional violations of the substantive provisions of the Fourteenth Amendment by the States can justify a statute abrogating their immunity in order to "enforce" those substantive provisions against them. To determine what sort of history would be required in the bankruptcy context, we must consider what substantive rights the Amendment grants. Certainly, it bestows no express right to bankruptcy relief of any sort. Furthermore, the Supreme Court has held that there is no constitutional right to a bankruptcy discharge, *United States v. Kras*, 409 U.S. 434, 446–47, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), and seems unlikely now to recognize any other general bankruptcy rights as inherent in the Constitution. The Court has not relied on the Privileges and Immunities Clause of the Amendment as a source of an implied or unstated constitutional right for many years, relying instead on the Due Process Clause as such a source. *Sacred Heart Hosp.*, 133 F.3d at 244–45 & n. 11. The Due Process Clause of the Amendment prohibits a State from depriving a person of property without due process of law, and we can assume without deciding that at least some licenses, permits, charters, franchises, and other similar grants constitute "property" protected by the Clause. The Clause has been interpreted to require both (1) procedural due process—no deprivation of property unless fair procedures are used in doing so—and (2) substantive due process—no deprivation for an arbitrary reason, even if the procedures used are fair. *Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs.*, 936 F.2d 483, 489–90 (10th Cir. 1991); *see also Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 528–29 (10th Cir. 1998) (indicating substantive due process is violated if government action shocks consciences of federal judges, standard that may be equivalent to arbitrariness, or may be measure of arbitrariness required for executive rather than legislative action to violate substantive due process). Protecting people from State deprivations of their property based solely on their bankruptcy filing might provide a Fourteenth Amendment basis for § 106(a), if the Supreme Court would conclude that such deprivations are arbitrary or "shock the consciences" of the Justices. In *Kras*, the Court also held that classifications based on bankruptcy and challenged under the Equal Protection Clause are acceptable if supported by a rational justification. 409 U.S. at 445, 93 S.Ct. 631. Protecting people who file for bankruptcy from State discrimination based solely on their filing might also provide a Fourteenth Amendment basis for § 106(a), if the Supreme Court would conclude that such discrimination has no rational justification.

Can §§ 362(a) and 525(a), as they might be applied to the States, be viewed as tailored to remedy or prevent State conduct violating those Fourteenth Amendment rights? The automatic stay imposed by § 362(a) temporarily prevents creditors and other interested entities from taking certain actions against people who file for bankruptcy, a provisional remedy that might, in part, prevent States from violating those rights. Section 525(a) provides in pertinent part:

(a) ... [A] governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition

such a grant to, [or] discriminate with respect to such a grant against, ... a person that is ... a debtor under this title ... solely because such bankrupt or' debtor is ... a debtor under this title ..., has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title....

11 U.S.C. § 525(a). This provision might also, in part, prevent States from taking debtors' property arbitrarily or discriminating against them without a rational justification. So, if Congress had identified a history of States unconstitutionally acting in violation of the stay, or taking property from or discriminating against people who filed for bankruptcy, then § 106(a) might be a proper exercise of Congress' power to enforce the Fourteenth Amendment. However, we have not been directed to nor found any indication that Congress has ever identified such a history, either when it amended § 106 in 1994, *see* H.R.Rep. No. 103–835 at 42 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3340, 3350–51. or when it originally enacted §§ 362(a) and 525(a) in 1978 as part of the new Bankruptcy Code.

For § 525(a) alone, the dissent suggests the Supreme Court's decision in *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), supplies the necessary history. That case involved a Supremacy Clause challenge to a provision in Arizona's Motor Vehicle Safety Responsibility Act. Under that Act, a person against whom a judgment had been entered for damages arising from an automobile accident could have his or her driver's license and registration suspended if the judgment remained unsatisfied for sixty days, and the suspension would continue until the judgment was paid. *Id.* at 641–42, 91 S.Ct. 1704. The challenged provision declared that " '[a] discharge in bankruptcy ... shall not relieve the judgment debtor from any of the requirements of this article.' " *Id.* at 642, 91 S.Ct. 1704 (quoting

Ariz.Rev.Stat. Ann. § 28–1163(B)). Provisions requiring proof of financial responsibility for a future period were not before the Court. *Id.* at 642–43, 91 S.Ct. 1704. The Arizona Supreme Court had ruled that the main purpose of the Act was to protect the public using the highways from financial hardship that might result from the use of automobiles by financially irresponsible persons. *Id.* at 644, 91 S.Ct. 1704 (relying on and quoting from *Schecter v. Killingsworth*, 93 Ariz. 273, 380 P.2d 136 (1963), and citing many later cases following this ruling). Overruling two of its prior cases that had upheld similar state laws, the Supreme Court held this Arizona provision violated the Supremacy Clause by frustrating the purpose of the bankruptcy discharge to free debtors from the pressure and discouragement of most old debts. *Id.* at 649–52, 91 S.Ct. 1704. Thus, *Perez* addressed only a State's attempt to avoid part of the impact of a bankruptcy discharge by forcing the debtor to pay a discharged debt.

When it adopted the new Bankruptcy Code in 1978, Congress indicated that § 525(a) codified *Perez*. H.R.Rep. No. 595, 95th Cong., 1st Sess. 366–7 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978). While that is true so far as it goes, we note that § 525(a) also extended well beyond *Perez*. In that case, Arizona had not denied, revoked, suspended, or refused to renew the debtors' drivers' licenses and registration solely because they had filed for bankruptcy or were insolvent, but only because they had not paid a debt that had been discharged in bankruptcy. The portions of § 525(a) that prohibit acting against a person solely for filing for bankruptcy, or for being insolvent before filing for bankruptcy, thus cannot accurately be said to be derived from *Perez*. In addition, it appears the Arizona law required all judgment debtors, not just those who obtained a bankruptcy discharge, to pay the judgments against them arising out of automobile accidents before they could get their licenses renewed. The anti-discrimination portions of § 525(a), then, are not

really based on *Perez*, either. In passing, we note that in the case before us, Wyoming did not require Straight to pay a discharged or dischargeable debt. For present purposes, although the Fourteenth Amendment was not involved in *Perez*, we may assume that the States would violate the Due Process Clause of the Amendment if they took property from a debtor in violation of the Supremacy Clause, or would violate the Equal Protection Clause if they discriminated against a debtor in violation of the Supremacy Clause. Nevertheless, *Perez* supplies at most a history of unconstitutional State actions that could support the prohibition in § 525(a) against denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to a person who has not paid a debt that is dischargeable or has been discharged. It provides no indication the States had a history of doing the other things prohibited by § 525(a).

The extensions of *Perez* found in § 525(a) indicate to us that the Supreme Court would conclude that Congress failed to restrict the provision to cases involving arguable constitutional violations by the States. This renders it so out of proportion to a supposed remedial or preventive object that it cannot be understood to be in response to or designed to prevent unconstitutional behavior, which the Court said in *Florida Prepaid* was required to make Congress' abrogation of the States' sovereign immunity a permissible exercise of its power to enforce the Fourteenth Amendment. Instead, somewhat like the patent law at issue in *Florida Prepaid*, § 525(a) appears to have been intended to subject the States to the limitations and place them on the same footing as private parties would be under bankruptcy law if they had the States' power to regulate activities requiring licenses, permits, and similar grants of authority.

Because the history of unconstitutional State actions is so limited and § 525(a) addresses so many State actions not involved in that history, we conclude that the abrogation attempted in § 106(a)(1) is invalid even if we must consider it only in connection with § 525(a). We do not ignore the bankruptcy court's finding that the DOT violated §§ 362(a) and 525(a) because it revoked Straight's DBE certification while the automatic stay was in effect and solely because she had filed for bankruptcy, or condone the DOT's actions if in fact so motivated. These actions might even constitute a violation of Straight's rights under the Fourteenth Amendment, and make this case one that might contribute to a history that Congress could rely on to abrogate the States' immunity in the future for similar actions. However, the Supreme Court's decisions have made clear that Congress cannot assume the States might violate debtors' Fourteenth Amendment rights in the future and abrogate the States' immunity based on that assumption. Instead, if the States actually demonstrate a propensity to take unconstitutional actions, then Congress may, acting within its authority to enforce the substantive provisions of the Fourteenth Amendment, forcibly subject the States to private parties' suits for future violations. In § 106(a) of the Bankruptcy Code, Congress has exceeded its authority under § 5 of the Fourteenth Amendment.

## V. Conclusion

The bankruptcy court's order denying the DOT's motion to dismiss the Damages Suit was premised on an incorrect application of the law of the case doctrine that overlooked the factual differences between the Fee Order at issue in *Straight I* and *Straight II* and the Damages Suit. Moreover, because § 106(a) represents an invalid attempt to abrogate the DOT's sovereign immunity, the Damages Suit must be dismissed. The bankruptcy court's order is REVERSED, and the case is remanded for entry of an order granting the DOT's motion to dismiss.

BOULDEN, Bankruptcy Judge, Dissenting.

I concur in much of the majority's analysis of this case. On the pivotal issue of

whether § 106(a), as it relates to § 525(a), is a valid abrogation of the States' sovereign immunity, however, I dissent. I would affirm the bankruptcy court and allow the Damages Suit to proceed, because § 106(a) is a valid abrogation of the States' sovereign immunity when read in conjunction with § 525(a).

## I. A Constitutional Analysis of § 106(a) must be made on a Statute–by–Statute Basis

The history and current language of § 106(a) requires that any analysis to test the constitutionality of the statute be conducted separately for each specific Bankruptcy Code section listed in § 106(a)(1) under which a plaintiff seeks relief against a State. Prior to 1994, Congress attempted to abrogate the States' sovereign immunity under § 106(c)[1] with statutory language that made the statute applicable to any provision of the Bankruptcy Code which contained certain "trigger words." 11 U.S.C. § 106(c)(1) (repealed 1994). After former § 106(c) was held to be an invalid abrogation of sovereign immunity because it did not unequivocally express an intent to abrogate, *Hoffman v. Connecticut Department of Income Maintenance*, 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989); *see United States v. Nordic Village, Inc.*, 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), Congress amended § 106 under the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394 (Oct. 22, 1994).

In what is now § 106(a), Congress not only made its intent to abrogate the States' sovereign immunity unequivocally clear, it dramatically changed the abroga-

tion provision by making it applicable to sixty specific sections of the Bankruptcy Code. The broad abrogation language of § 106(a) was qualified, with it now being expressly applicable "with respect to" only those Code provisions listed in subsection (1). 11 U.S.C. § 106(a).

Despite this fact, the courts that have examined the constitutionality of § 106(a) have looked only at the general abrogation language, failing to apply the narrow, qualifying language. *See, e.g., Sacred Heart Hosp. v. Pennsylvania Dep't of Pub. Welfare (In re Sacred Heart Hosp.)*, 133 F.3d 237, 243–44 (3d Cir.1998); *Department of Transp. & Dev. v. PNL Asset Management Co. LLC (In re Fernandez)*, 123 F.3d 241, 245 (5th Cir.1997); *Schlossberg v. Maryland Comptroller of the Treasury (In re Creative Goldsmiths of Washington D.C., Inc.)*, 119 F.3d 1140, 1146–47 (4th Cir. 1997), *cert. denied*, 523 U.S. 1075, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998); *In re Merchants Grain, Inc.*, 59 F.3d 630 (7th Cir. 1995), *cert. granted and decision vacated*, 517 U.S. 1130, 116 S.Ct. 1411, 134 L.Ed.2d 537 (1996). This view is contrary to the plain language of § 106(a), and to the general rule of statutory construction that every provision of a statute must have some operative effect. *See, e.g., Walters v. Metropolitan Educ. Enters., Inc.*, 519 U.S. 202, 208, 117 S.Ct. 660, 136 L.Ed.2d 644 (1997); *Nordic Village*, 503 U.S. at 36, 112 S.Ct. 1011; *Hoffman*, 492 U.S. at 103, 109 S.Ct. 2818. It is also contrary to the rule that Congress is presumed to have intended to include provisions within a statute, and that such inclusions must be purposeful.[2] *See, e.g., Russello v. United States,*

---

1. Section 106(c), prior to 1994, stated:

 Except as provided in subsections (a) [dealing with waiver] and (b) [dealing with offset] of this section and notwithstanding any assertion of sovereign immunity—
 (1) a provision of this title that contains "creditor", "entity", or "governmental unit" applies to governmental units; and
 (2) a determination by the court of an issue arising under such a provision binds governmental units.

11 U.S.C. § 106(c) (repealed 1994).

2. I note also that reading § 106(a) as it relates to § 525(a) is in accord with the "doctrine of constitutional doubt," which generally holds that " 'every reasonable construction [of a statute] must be resorted to, in order to save [it] from unconstitutionality.' " *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council*, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (quoting *Hooper v. California*, 155 U.S. 648,

464 U.S. 16, 22, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *Hearn v. Western Conference of Teamsters,* 68 F.3d 301, 304 (9th Cir.1995); *see also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 35, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998).

A reading of the statute that applies its plain language and the rules of statutory construction, mandates that § 106(a) be read in conjunction with the particular Code section provided for in subsection (1) under which a debtor seeks affirmative relief. Here, Straight seeks damages against the DOT related to its violation of §§ 362 and 525(a), so my analysis is confined to those sections.[3]

## II. The "Valid Exercise of Power" Test

As discussed by the majority, the second prong of the two part test in *Seminole Tribe v. Florida,* 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), instructs that Congress may only abrogate the States' sovereign immunity if it is acting pursuant to a "valid exercise of power" under § 5 of the Fourteenth Amendment. The "valid exercise of power" test requires that the statute in question implicate the Fourteenth Amendment, and meet certain limitations as set forth in *City of Boerne v. Flores,* 521 U.S. 507, 518–19, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *See Kimel*

*v. Florida Bd. of Regents,* —— U.S. ——, 120 S.Ct. 631, 644–45, 145 L.Ed.2d 522 (2000); *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 119 S.Ct. 2219, 2224, 144 L.Ed.2d 605 (1999); *Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank,* 527 U.S. 627, 119 S.Ct. 2199, 2205–2206, 144 L.Ed.2d 575 (1999). I conclude that § 106(a), as it relates to § 525(a), validly abrogates the States' sovereign immunity because it both implicates the Fourteenth Amendment and it is appropriate legislation under *Boerne.*

### A. Section 106(a), as it relates to § 525(a), implicates § 5 of the Fourteenth Amendment

No express language is required to prove that a statute implicates the Fourteenth Amendment. "Congress need not 'recite the words' 'section 5' or 'Fourteenth Amendment' ... when enacting laws pursuant to this power, [but] if Congress does not explicitly identify the source of its power as the Fourteenth Amendment, there must be something about the act connecting it to recognized Fourteenth Amendment aims." *Sacred Heart Hospital,* 133 F.3d at 244 (citation and internal quotations omitted); *accord Kimel,* 120

657, 15 S.Ct. 207, 39 L.Ed. 297 (1895)); *accord Edmond v. United States,* 520 U.S. 651, 658, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997). Thus,

"where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter." *United States ex rel. Attorney General v. Delaware & Hudson Co.,* 213 U.S. 366, 408, [29 S.Ct. 527, 53 L.Ed. 836] (1909).... It is "out of respect for Congress, which we assume legislates in the light of constitutional limitations," *Rust v. Sullivan,* 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), that we adhere to this principle, which "has for so long been applied by this Court that it beyond debate." *Edward J. DeBartolo Corp.,* 485 U.S [568 at] 575, [108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)]....

*Jones v. United States,* 526 U.S. 227, 239–40, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *accord, Almendarez–Torres v. United States,* 523 U.S. 224, 237–38, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); *Branson School Dist. RE–82 v. Romer,* 161 F.3d 619, 636 (10th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1461, 143 L.Ed.2d 546 (1999).

3. The majority argues, in part, that because § 106(a) may be made applicable to many Code sections which do not implicate State action or which involve State action that is not wrongful, § 106(a), on a whole, is not "aimed at preventing States from violating the Fourteenth Amendment." *Supra,* p. 417. This analysis, like the analysis of the circuit courts holding § 106(a) to be unconstitutional, does not narrow the scope of review to the particular facts of the case being considered. The only issue in this case is whether § 106(a), as it relates to §§ 362 and 525, is constitutional.

S.Ct. at 644; *Equal Employment Opportunity Comm'n v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (citing *Fullilove v. Klutznick*, 448 U.S. 448, 476–78, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948)). It is sufficient that a statute "could reasonably" have been authorized by the Fourteenth Amendment, and it is not necessary that Congress actually intended to invoke that authority. *Franks v. Kentucky School for the Deaf*, 142 F.3d 360, 363 (6th Cir.1998); *see Equal Employment*, 460 U.S. at 243 n. 18, 103 S.Ct. 1054; *Wheeling & Lake Erie Railway Co. v. Public Utility Comm'n*, 141 F.3d 88, 92 (3d Cir.1998); *Crawford v. Davis*, 109 F.3d 1281, 1283–84 (8th Cir. 1997).

The Fourteenth Amendment provides that no State shall "deprive any person of ... property ... without due process of law." U.S. Const. amend. XIV, § 1.[4] The "Due Process Clause," therefore, applies only to a "deprivation" of a "protected property interest" by a State without "due process of law." *College Sav. Bank*, 119 S.Ct. at 2224; *Florida Prepaid*, 119 S.Ct. at 2208–09.

### (a) Protected property interest

"The hallmark of a protected property interest is the right to exclude others." *College Sav. Bank*, 119 S.Ct. at 2224. The test is whether the holder of the property interest has "a legitimate claim of entitlement to it." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *accord Greene v. Barrett*, 174 F.3d 1136, 1140 (10th Cir.1999). Discussing the definition of a property interest protected under the Due Process Clause, the Court in *College Savings Bank*, 119 S.Ct. at 2225, stated: "The assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment."

Under certain circumstances, protected property interests include business assets, such as licenses, permits, grants, or entitlements issued by governmental units. "Where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Cornelius v. La Croix*, 838 F.2d 207, 210 (7th Cir.1988) (discussing whether MBEs (similar to a DBE) certified on a contract-by-contract basis represented a protected property right); *see North Am. Group, Inc. v. County of Wayne*, 106 F.3d 401, 1997 WL 34658 (6th Cir. Jan.28, 1997) (unpublished decision) (plaintiff had a property interest in DBE certification if it had a "legitimate claim of entitlement" to continued possession, citing *Roth*, 408 U.S. at 577, 92 S.Ct. 2701); *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 676–77 (7th Cir. 1987) (in preliminary injunction action, contractor, asserting City had violated the Due Process Clause, established a likeli-

---

**4.** The Fourteenth Amendment also states: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Section 525(a) does not appear to implicate the Equal Protection Clause of the Fourteenth Amendment, although the title to that section, which references protection against discriminatory treatment, and its text, which refers to discrimination, may indicate otherwise. *See United States v. Kras*, 409 U.S. 434, 445, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) ("Bankruptcy is hardly akin to free speech or marriage or to those other rights, so many of which are imbedded in the First Amendment, that the Court has come to regard as fundamental and that demand the lofty requirement of a compelling governmental interest before they may be significantly regulated. Neither does it touch upon what have been said to be the suspect criteria of race, nationality, or alienage.... This being so, the applicable standard, in measuring the propriety of Congress' classification, is that of rational justification." (citations omitted)); *see also United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996) (subtitle heading in statute is not controlling).

hood of showing that it had a protected property interest in MBE certification because the City already conferred that benefit upon it).

*(b) Deprivation without due process*

A violation of the Due Process Clause of the Fourteenth Amendment is not possible unless it is demonstrated that a person is "deprived" of its protected property interest without due process. *Florida Prepaid,* 119 S.Ct. at 2208. This element requires a showing that the holder of the protected property interest had "no remedy, or only inadequate remedies" against the State's taking of its protected property interest. *Id.* The State must also act intentionally in taking the protected property interest, rather than a taking that may have occurred through negligence or mistake. *Id.,* 119 S.Ct. at 2209.

Even if there is an intentional governmental taking of a protected property interest, there is no violation of the Fourteenth Amendment unless the taking occurs without due process. Procedural due process ensures that a State will not deprive a person of property, unless fair procedures are used in making that decision. Substantive due process guarantees that the State will not deprive a person of property for an arbitrary reason, regardless of how fair the procedures are that are used in making the decision. *Archuleta v. Colorado Dep't of Insts., Div. of Youth Servs.,* 936 F.2d 483, 490 (10th Cir.1991); *see Clark v. City of Draper,* 168 F.3d 1185, 1190 (10th Cir.1999) ("An arbitrary deprivation of an individual's property right can violate the substantive component of the Due Process clause of the Fourteenth Amendment ... [but] any substantive due process claim" must "shock the conscience," and "[t]o reach that level, the government action must

be deliberate, rather than merely negligent."); *Tonkovich v. Kansas Bd. of Regents,* 159 F.3d 504, 529 (10th Cir.1998) (there is some indication the "shocks the conscious" standard of substantive due process and the "arbitrariness" standard are used interchangeably when applied to administrative action); *see also Greene,* 174 F.3d at 1141 (finding a deprivation of property interest of sheriff's rank and denial of due process where sheriff had no hearing before his reduction in rank); *Blue Diamond Coal Co. v. Angelucci (In re Blue Diamond Coal Co.),* 145 B.R. 895 (Bankr.E.D.Tenn.1992) (discussing Fourteenth Amendment due process claim and § 525 claim related to revoking certificate of self-insurance).

*(c) Application of Fourteenth Amendment elements to § 525(a)*

Relating these factors to this case, I conclude that Congress was legislating under § 5 of the Fourteenth Amendment when it enacted § 106(a), as it relates to § 525(a). *See* Kenneth N. Klee, James O. Johnson, & Eric Winston, *State Defiance of Bankruptcy Law,* 52 Vand. L.Rev. 1527, 1545–51 (1999) (§ 525 may create a "limited exception" to finding § 106(a) constitutional) and 1578–81 (recognizing that under *Florida Prepaid* there may be instances where § 106(a), as it relates to the sections in subsection (1), may be constitutional if the section to which it relates deals with property interests protected under the Due Process Clause).

By its express terms, § 525(a)[5] applies to a narrow set of specifically enumerated property interests. It applies only to licenses, permits, charters, franchises, or similar rights granted by a State. If the holder of such an interest has a legitimate claim of entitlement to it, the property interest is protected under the Fourteenth

5. Since our facts differ, we need not address here that portion of § 525(a) proscribing a State's termination of a debtor's employment solely because of a bankruptcy filing. *Hennigh v. City of Shawnee,* 155 F.3d 1249, 1254 (10th Cir.1998) (holding that under certain conditions a state statute or regulation can create a protected property interest in employment status or rank).

Amendment. Section 525(a) also prevents the States from depriving the holder of that protected property interest. It precludes the States from intentionally [6] denying, revoking, suspending or refusing to renew a license or other grant simply because of the holder's status as a debtor or insolvent, or because a discharged debt owed by the holder goes unpaid. All of these proscribed acts would constitute a deprivation if they occurred in relation to a protected property interest. Section 106(a), as it relates to 525(a), also assumes that a debtor, as the holder of the protected property interest, would have "no remedy, or inadequate remedies" against the State's taking of its interest because it presumes that, unless abrogated, sovereign immunity would preclude an action against the State. Section 525(a) also implicates substantive due process because it proscribes arbitrary governmental taking based *solely* upon a property holder's status as debtor or insolvent, or because such a holder fails to pay a discharged or dischargeable debt.

B. *Section 106(a), as it applies to § 525(a), is appropriate legislation under Boerne*

In addition to implicating § 5 of the Fourteenth Amendment, § 106(a), as it relates to § 525(a), is appropriate legislation under *Boerne*, 521 U.S. at 519–20, 117 S.Ct. 2157. As discussed by the majority, in *Boerne*, the Court held that Congress' powers under § 5 of the Fourteenth Amendment are limited to "enforcing" the protections set forth in § 1 of the Amendment. Congress may not, therefore, define violations of § 1, but rather may only enact legislation that "remedies" such violations. In so holding, the Court stated:

While the line between measures that remedy or prevent unconstitutional actions and measures that make a substan-

tive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect.

*Id.,* quoted in *Florida Prepaid,* 119 S.Ct. at 2206; *accord Kimel,* 120 S.Ct. at 644. The Court in *Boerne* "held that for Congress to invoke § 5, it must identify conduct transgressing the Fourteenth Amendment's substantive provisions, and must tailor its legislative scheme to remedying or preventing such conduct." *Florida Prepaid,* 119 S.Ct. at 2207; *accord Kimel,* 120 S.Ct. at 644. In so doing, the courts must be "guided by the principle that the propriety of any § 5 legislation 'must be judged with reference to the historical experience ... it reflects.'" *Florida Prepaid,* 119 S.Ct. at 2207 (quoting *Boerne,* 521 U.S. at 525, 117 S.Ct. 2157).

Applying this test, the Court in *Boerne,* and later in *Florida Prepaid* and *Kimel,* looked to the legislative history of the statutes in question to determine whether there was evidence of a Fourteenth Amendment violation that required a remedy. There is no question that there is scant legislative history regarding § 525(a) that recites a pattern of the States depriving debtors' of their protected property interests without due process solely because of their status as debtors or insolvents, or because discharged debts had not been paid. However, the "historical experience" of § 525(a) indicates that it was enacted by Congress in response to a specific problem identified in 1971 in Supreme Court case law. *See Exquisito Servs., Inc. v. United States (In re Exquisito Servs.,*

---

**6.** *Compare Florida Prepaid,* 119 S.Ct. at 2205–09 (Patent Remedy Act did not implicate Fourteenth Amendment; the Act was drafted in a manner that would include negligent acts as well as intentional patent infringement). It

is difficult to conjure a circumstance where a governmental unit could negligently commit a taking of property based solely on the person's status as a debtor, insolvent, or because of the discharged nature of a debt.

*Inc.),* 823 F.2d 151, 154 (5th Cir.1987) (describing the history of § 525). In 1973–1978, when proposed amendments to the former Bankruptcy Act were being discussed and debated, the problems § 525(a) was meant to solve had already been identified by the Supreme Court and there was no need for testimony and debate on the issue.

Section 525(a) is a codification of *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). H.R.Rep. No. 595, 95th Cong., 1st Sess. 366–7 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978). In *Perez* the Court concluded that the Supremacy Clause [7] invalidated a part of Arizona's Motor Vehicle Safety Responsibility Act as being in conflict with the mandate of § 17 of the former Bankruptcy Act. *Perez* made clear that it was attempting to foreclose State actions that had the " 'plain and inevitable effect' " of collecting discharged debts, thereby contravening the purpose of the bankruptcy laws. *Perez,* 402 U.S. at 650, 91 S.Ct. 1704 (quoting *Kesler v. Dep't of Public Safety,* 369 U.S. 153, 183, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962) (Black, J., dissenting)).

Unlike the statutes in *Boerne, Florida Prepaid,* and *Kimel,* where the Court found little evidence in the Congressional record to support a pattern of State infringement of protected rights upon which to base remedial action, § 525(a) was enacted to codify what the Court itself held to be unconstitutional State conduct. The lack of legislative history to § 525(a) identifying a pattern of Fourteenth Amendment violations, therefore, is not an indication that Congress was defining, as opposed to remedying, such violations. Indeed, prior to the enactment of § 525(a), *Perez* prevented the States from depriving debtors of the property interests protected therein. If Congress had been able to identify a pervasive pattern

of State infringement of protected property rights as a result of a debtor's status or discharge in 1978 when it enacted § 525(a), it would have meant that States had been failing to adhere to *Perez* for the prior seven years since *Perez* was issued.

Not only does § 525(a) "remedy" impermissible State conduct as identified in *Perez,* rather than attempt to define Fourteenth Amendment violations, but it is also narrowly drafted so as to be in harmony with and in proportion to the alleged constitutional violation. *Boerne,* 521 U.S. at 532, 117 S.Ct. 2157; *accord, Kimel,* 120 S.Ct. at 644 & 647; *Florida Prepaid,* 119 S.Ct. at 2206 & 2209. Section 525(a) is not "so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior." *Boerne,* 521 U.S. at 532, 117 S.Ct. 2157, *quoted in Kimel,* 120 S.Ct. at 647; *Florida Prepaid,* 119 S.Ct. at 2210. Specifically, § 525(a) narrowly defines a select group of "property interests" protected by the Fourteenth Amendment, *i.e.,* licenses, permits, charters, franchises and similar grants to which a debtor may have a legitimate claim of entitlement. Section 525(a) also narrowly specifies prohibited State conduct, *i.e.,* intentional denial, revocation, suspension, or refusal to renew a protected property interest solely because of the holder's status as a debtor or insolvent, or because of its failure to repay a dischargeable or discharged debt. *Id.* Unlike the legislation considered in *Florida Prepaid,* the activities prohibited in § 525(a) cannot come about due to negligence on the part of the State. This narrow drafting remedies the problem identified in *Perez,* thereby preventing States from acting in conflict with the purpose of the bankruptcy laws to "give debtors 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discour-

---

**7.** At footnote 10, *Perez* indicates that the bankrupt alleged the Arizona statute denied Fourteenth Amendment due process and equal protection. Unfortunately for our purposes,

the Supreme Court found it unnecessary to address this claim. 402 U.S. at 644 n. 10, 91 S.Ct. 1704.

agement of pre-existing debt.'" *Perez*, 402 U.S. at 648, 91 S.Ct. 1704 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

The majority contends that § 525(a) is not really based on *Perez* because it is much broader than a State's attempt to avoid part of the impact of a bankruptcy discharge by forcing the debtor to pay a discharged debt which was the issue addressed in *Perez*. I respectfully disagree. The portion of § 525(a) which the majority finds to be an impermissible expansion of *Perez* is that section that prevents government action based upon the debtor's status of having filed for bankruptcy, being insolvent before bankruptcy, or being associated with a bankrupt or debtor. My reading of *Perez* indicates the facts of the case match the language of § 525(a). In *Perez*, both Adolfo and Emma Perez filed bankruptcy. However, only Mr. Perez, driving in a car registered in his name but community property under the laws of Arizona, was involved in an accident prepetition. Both Mr. and Mrs. Perez confessed judgment, and both Mr. and Mrs. Perez's drivers licenses and registration were suspended. As stated in Justice Blackmun's concurrence, "Emma, a fault-free driver, 'is without her license solely because she is the impecunious wife of an impecunious, negligent driver in a community property state.'" *Perez*, 402 U.S. at 669, 91 S.Ct. 1704 (quoting amicus brief). The concurrence, as it relates to Emma Perez, concludes that the Arizona statutes interfered with her bankruptcy discharge and violated the Supremacy Clause, but disagreed

with the majority ruling as it related to Adolfo Perez. Therefore, I disagree that § 525(a)'s attempt to prohibit governmental action based upon status as a bankrupt or debtor, or association with a bankrupt is unrelated to, or cannot accurately be said to be derived from, *Perez*.

The legislative history to § 525(a) also makes clear that it was enacted to codify *Perez*. H.R.Rep. No. 595, 95th Cong., 1st Sess. 366–7 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978); Hearings on S. 234 and S. 236 before the Senate Subcomm. on Improvements in Judicial Machinery, 94th Cong., 1st Sess., at p. 37 (1975) (testimony of Prof. Frank Kennedy) [Hereinafter "1975 Hearings"].[8] Furthermore, the language of § 525(a) results from Congress' attempt to narrow proscribed discriminatory behavior originally discussed in *Perez*. As originally proposed, the anti-discrimination statute provided:

> *Section 4–508. Protection Against Discriminatory Treatment.* A person shall not be subjected to discriminatory treatment because he, or any person with whom he is or has been associated, is or has been a debtor or failed to pay a debt discharged in a case under the Act. This action does not preclude consideration, where relevant, of factors other than those specified in the preceding sentence, such as present and prospective financial condition or managerial ability.

Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess., Pt. 2

---

**8.** Testifying as to "the record that led" to proposed anti-discrimination legislation, Professor Kennedy stated: "[T]he Commission was thinking primarily, if not exclusively, of discriminations imposed by the Government. We were seeking to implement the *Perez* case." 1975 Hearings, at p. 37. I note also the "record" giving rise to anti-discrimination legislation included not only *Perez*, but also *Kesler v. Dep't of Public Safety*, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641 (1962) and *Reitz v. Mealey*, 314 U.S. 33, 62 S.Ct. 24, 86 L.Ed. 21 (1941), both of which were overturned by

the Court in *Perez*. Both of these cases involved State legislation, similar to that addressed in *Perez*, depriving debtors of licenses, and having the "plain and inevitable effect" of circumventing bankruptcy law. In his testimony before Congress, Professor Kennedy refers to other State statutes and regulations "depriving persons of economic opportunity because they had gone into a bankruptcy or had obtained a discharge in bankruptcy," that, although not before the Court in *Perez*, were within the type of State action disallowed by *Perez*. 1975 Hearings, at p. 37.

at 143–44 (1973). This provision was later modified to what is now § 525(a) when Congress received complaints that it was too broad, thereby going beyond the problems as discussed by both the majority and concurrence in *Perez.* 1975 Hearings, at p. 37 (testimony of Prof. Frank Kennedy) (citing supporting authority), p. 129 (testimony of Walter W. Vaughn on behalf of the American Bankers Ass'n & Consumer Bankers Ass'n), & pp. 146 & 173 (testimony of Alvin O. Wiese, Jr., Chairman of the Subcomm. on Bankruptcy of the Law Forum of the Nat'l Consumer Fin. Ass'n). Section 525(a), therefore, is narrowly drafted to specifically identify the interests protected and the State conduct proscribed.

### III. Section 106(a), as it Relates to § 525(a), Applied to the Facts of this Case

It is undisputed that the DOT revoked Centerline's DBE certification to which Straight had a legitimate claim of entitlement, and which is akin to a license, permit or other similar grant, in violation of § 525(a). The DBE Certification was within Straight's "exclusive dominion," and, as held in *Straight II,*[9] was an asset of Straight's business. Centerline's DBE certification is therefore a property interest protected under the Fourteenth Amendment. *See Baja Contractors,* 830 F.2d at 676–77 (plaintiff had established a likelihood of showing that it had a protected property interest in MBE certification because the City had already conferred that benefit upon it).

The DOT's revocation of Centerline's DBE Certification was an action specifically proscribed in § 525(a). Further, it was an intentional, as opposed to a negligent act. The DOT's revocation deprived Straight of her protected property interest

without due process, upon a mere pretext, an incorrect legal conclusion and without hearing. Straight was afforded "no remedy, or only inadequate remedies" against the DOT because, absent the abrogation of sovereign immunity provided in § 106(a), no recovery action against the DOT was allowed. The DOT's revocation of the DBE Certification also offended principles of substantive due process because it was based solely on Straight's status as a debtor which, under § 525(a), is impermissible and arbitrary.

These facts, supported by the appellate record, demonstrate that § 106(a), as it applies to § 525(a), was enacted by Congress pursuant to a valid exercise of power under § 5 of the Fourteenth Amendment. The Fourteenth Amendment is implicated by the DOT's deprivation of Straight's protected property interest without due process, and § 525(a) was enacted by Congress within the limitations set forth in *Boerne.*

### IV. Section § 106(a) as it Relates to § 362

My dissent is based on the conclusion that, contrary to the majority, I would allow the Damages Suit to proceed because § 106(a), as it relates to § 525(a), constitutionally abrogates the DOT's sovereign immunity. A separate analysis employing the same criteria set forth above is required to review whether § 106(a), as it relates to § 362, the other section implicated in the Damages Suit, is a valid abrogation of sovereign immunity. Such an analysis serves as much to identify the elements that prove the constitutionality of § 106(a) as it applies to § 525, as it does to affirm that § 106(a), as applied to § 362, does not pass constitutional mus-

---

9. In *Straight II,* the Tenth Circuit stated:
 Ms. Straight ... initially sought the restoration of the certificate she owned prior to bankruptcy that was essential to the conduct of her postpetition business.... We believe, therefore, there can be no doubt

that in this quest the Debtor was in every sense seeking the return of property of the estate as that concept is broadly defined in 11 U.S.C. § 541(a)(1).
 *Straight II,* 143 F.3d at 1391.

ter.[10] Section 362, unlike § 525(a), is so broad in application that it cannot be said to be remedial legislation in the spirit of *Boerne.*

## V. Conclusion

For the reasons set forth above, I respectfully dissent because I conclude that § 106(a), as it relates to § 525(a), validly abrogates the DOT's sovereign immunity, and therefore the Damages Suit should be allowed to proceed.

10. Not all actions under § 362 implicate protected property rights, which is a threshold requirement under the Fourteenth Amendment. Instead, §§ 362(a)(1) and (2) preclude actions against a debtor. Section 362 applies to entities in addition to governmental units, but only governmental units are implicated under the Fourteenth Amendment. Instead of preventing a "deprivation," § 362(a) precludes certain activities until, upon motion pursuant to § 362(d), the court determines if grounds exist for terminating, annulling, modifying, or conditioning the stay. Further, though actions that violate the stay may occur without due process, such actions may also commence or continue due process proceedings in other courts. 11 U.S.C. § 362(a)(1)-(2) and (8). In short, § 362 was drafted to proscribe such a broad spectrum of activities against both the debtor and estate that it does not implicate the Fourteenth Amendment.